586 S.E.2d 170

VERIZON WEST VIRGINIA, INC.,
et al., Petitioners Below,

Eastern Associated Coal Corporation,
Appellant,

v.

WEST VIRGINIA BUREAU OF EM-
PLOYMENT PROGRAMS, WORKERS'
COMPENSATION DIVISION, Respon-
dent Below, Appellee.

Verizon West Virginia, Inc., et
al., Petitioners Below,

Weirton Steel Corporation, Appellant,

v.

West Virginia Bureau Of Employment
Programs, Workers' Compensation Di-
vision, Respondent Below, Appellee.

Verizon West Virginia, Inc., et
al., Petitioners Below,

Pine Ridge Coal Company, Appellant,

v.

West Virginia Bureau Of Employment
Programs, Workers' Compensation Di-
vision, Respondent Below, Appellee.

Nos. 30899–30901.

Supreme Court of Appeals of
West Virginia.

Submitted March 26, 2003.

Decided June 12, 2003.

Dissenting Opinion of Justice
Maynard July 2, 2003.

Concurring Opinion of Chief Justice
Starcher July 9, 2003.

Dissenting Opinion of Justice
Davis July 9, 2003.

Maynard, J., filed a dissenting opinion in which Davis, J., joined.

Starcher, C.J., filed a concurring opinion.

Davis, J., filed a dissenting opinion in which Maynard, J., joined.

Michael W. Carey, Carey, Scott and Douglas, PLLC, Phillip J. Combs, Allen, Guthrie & McHugh, Charleston, for the Appellant, Eastern Associated Coal Corporation.

Ancil G. Ramey, Henry C. Bowen, Michelle E. Piziak, Steptoe & Johnson, PLLC, Charleston, for the Appellant, Weirton Steel Corporation.

Sarah E. Smith, Heather G. Harlan, Bowles Rice McDavid Graff & Love, PLLC, Charleston, for the Appellant, Pine Ridge Coal Company.

Darrell V. McGraw, Jr., Attorney General, Silas B. Taylor, Senior Deputy Attorney General, Christie S. Utt, Assistant Attorney General, Randall B. Suter, Senior Counsel, WV Bureau of Employment Programs, Charleston, for the Appellee.

ALBRIGHT, Justice:

This case involves the consolidated appeals of three employers, Eastern Associated Coal

Corporation (hereinafter "EACC"), Pine Ridge Coal Company (hereinafter "Pine Ridge") and Weirton Steel Corporation (hereinafter "Weirton Steel") from the January 17, 2002, final order of the Circuit Court of Kanawha County. The final order affirmed the November 30, 2000, administrative order of the Commissioner of the Bureau of Employment Programs (hereinafter "Commissioner") which upheld the methodology used by the Bureau's Division of Workers' Compensation (hereinafter "the Division") to calculate premium rates for self-insured employers for fiscal year 1998 (hereinafter "FY 1998").[1] By way of this appeal, the employers continue to challenge the calculation of FY 1998 workers' compensation premium rates for self-insured employers on the grounds that it violates statutory, regulatory and constitutional provisions. In addition to reversal of the lower court's decision, Appellants seek: (1) adoption of Appellants' proposed findings of fact and conclusions of law as a resolution to the proceedings below; (2) an order directing the Division to comply with the Workers' Compensation Act, as interpreted by Appellants, and requiring the Division to maintain a separate surplus fund, including a second injury reserve; (3) return of overpayment of premiums due to the illegally fixed rates, including accrued interest; and (4) attorney fees and costs, with such other relief as may be found appropriate. After careful and reflective examination of the issues presented, we affirm the order of the court below and deny all relief requested.

## I. Background

To gain a clearer understanding of the issues presented through this appeal, we begin with an overview of the relevant provisions of the state's workers' compensation system. Through the establishment of the Workers' Compensation Fund (sometimes hereinafter referred to as the "Fund"), the Legislature created a state operated insurance system which provides coverage to West Virginia employers for personal injuries sustained by their employees during the course of and resulting from their employment. W. Va.Code Chapter 23. As designed by the Legislature, nearly all[2] employers in the state are required to acquire workers' compensation coverage or be subjected to the loss of certain common law defenses applicable to workplace injuries, which loss could prove to be devastating to an employer sued by injured employees. Injured employees[3] are protected by the system in that it provides an organized and predictable method by which employees receive compensation when they are incapacitated as a result of job-related diseases and workplace injuries. Consequently, by providing protection against such significant financial losses for both employers and employees, the workers' compensation system has become a rudimentary part of the economic fabric of this state.

Employers may participate in the mandatory portions of the workers' compensation system in one of three[4] ways: (1) by subscribing to the program for coverage of all risks; (2) by subscribing for a portion of risk coverage through the program but self-insuring against other risks; or (3) by electing to self-insure against all risks. Employers obtaining coverage by subscribing to the workers' compensation system pay premiums which are based upon: their respective payrolls for or hours worked by their employees; the business or function of those employees; the loss record of the employer over the years; and the cost of administering the system. The premiums are intended by law to cover the cost of administering the system and paying the benefits provided for those suffering workplace injuries or diseases.

---

1. Reference to FY 1998 means the time period of July 1, 1997 to June 30, 1998.

2. The few narrowly crafted exceptions to required participation in the system are defined in West Virginia Code § 23–2–1(b) and include, among others, employers of domestic services workers, employers of five or fewer full-time agricultural service employees and churches.

3. Virtually every working West Virginian is covered by the workers' compensation system, save a few exempted by statute or who may elect to be exempted, such as business owners and partners. *See* W.Va.Code § 23–2–1(g).

4. We do not address the alternative coverage available to all employers for excess liability stemming from deliberate intention actions. *See* W. Va.Code §§ 23–4C–1 to 5.

In lieu of subscribing to the Fund and paying premiums for risk coverage under the system, employers with the financial ability to elect to be self-insured as to all or part of their liabilities may do so under the Act.[5] Claims originating from employees of self-insured employers are processed and administered by the Division; however, the benefits due an employee for any injury for which the employer is self-insured are considered wholly the responsibility of the employer. Unlike subscribing employers for whom "charges" to their respective accounts mean simply the *potential* for higher premium payments in the future, employers self-insured for particular risks have the obligation to actually pay from their own resources any benefits due their injured employees.

Self-insured employers are required to contribute to "the expense of the administration" of the workers' compensation system by paying a portion of the premiums paid by subscribing employers. W. Va.Code § 23-2-9. Further, self-insured employers are required to post a bond with the Division, expected to be sufficient to cover claims for which the employer may later become liable but be financially unable to pay from available resources. *Id.*

In addition, state law had for some years required the Division and its predecessors to fix and collect premiums sufficient to develop a "surplus fund" to cover long-term liabilities of the system. The surplus fund was statutorily required to contain a special component known as the "second injury reserve," often referred to as the "second injury fund." The second injury fund comes into play when

> an employee who has a definitely ascertainable physical impairment, caused by a previous occupational injury, occupational pneumoconiosis or occupational disease . . . becomes permanently and totally disabled through the combined effect of such previ-

ous injury and a second injury received in the course of and as a result of his or her employment. . . .

W. Va.Code § 23-3-1(d)(1). The policy initially underlying the second injury fund was to encourage employers to hire people who may have suffered an earlier injury. This incentive allows a second or subsequent employer subscribing to the second injury fund to be charged only with the benefits directly attributable to the second injury when a previously injured employee suffers a subsequent injury resulting in a disability; if the injury results in a life award by reason of the employee being totally disabled, the second injury fund and not the current employer is charged with the costs of the life award. In contrast, employers not subscribing to the second injury fund, electing instead to self-insure against such second injuries, are charged the entire cost of a second injury life award. The legislative directive regarding the creation of a second injury reserve within the surplus fund contemplated the existence of a reserve for the payment of at least some of the cost of any such life award to a previously injured employee who later becomes totally disabled.

As related earlier, qualifying employers may elect to fully self-insure against all workplace risks or to self-insure against specific risks. Thus, an employer may be self-insured with respect to all general workers' compensation claims but elect to pay additional premiums to the Division for so-called second injury and catastrophe risks,[6] whereby life awards arising out of second injuries or awards of benefits arising from catastrophic events are paid by the system rather than the employer. In such instances, the otherwise self-insured employer is in the same posture as any other subscribing employer. Alternatively, an employer may elect to self-insure against second injuries[7] and

---

**5.** General reference to "the Act" in this opinion is to the Workers' Compensation Act, codified as Chapter 23 of the West Virginia Code.

**6.** Catastrophic incidents are those events where three or more employees are killed or receive extensive physical injuries defined in West Virginia Code § 23-3-1(c). Employers who obtain catastrophe coverage through the worker's compensation system have the aggregate of all medi-

cal and hospital bills and other costs as well as benefits paid from the catastrophe reserve of the surplus fund. Catastrophic events and the catastrophe reserve are mentioned in passing since they were not addressed by Appellants.

**7.** Under the provisions of West Virginia Code § 23-2-9(e), self-insurance is no longer an available option to employers generally for second injury risks; only those employers enjoying sec-

catastrophic risks. If self-insured with respect to second injuries, the employer undertakes to pay all workers' compensation second injury benefits thereafter due, including life awards, whether such benefits arise solely from second injuries or a combination of a second injury and previous injuries.

The three employer Appellants in the case before us are required to participate in the workers' compensation program and have elected to self-insure their risks, albeit in somewhat different ways. EACC is self-insured for general workers' compensation liabilities and subscribes to the Division for second injury coverage; Weirton Steel and Pine Ridge are wholly self-insured against general and second injury risks.[8] All of Appellants pay some level of premiums, the calculation of which was affected by legislative amendments enacted in the 1990's.

In 1993 and 1995, the Legislature substantially amended the Act. The 1993 amendments included the creation of a Compensation Programs Performance Council (hereinafter "Performance Council") consisting of nine members: four representing the interests of employers, four representing the interests of employees, and the Commissioner. *See* W. Va.Code § 21A–3–3.

In the 1995 amendment of the Act, the Legislature enacted a comprehensive revision of the requirements and methods for determining premiums for workers' compensation coverage and made specific changes to certain provisions concerning entitlement to benefits under the Act. W. Va.Code § 23–2–4. Because of the extensive revision in 1995 of the provisions of West Virginia Code § 23–2–4, a comparison of the statute as it appeared in 1993 versus 1995 will aid our discussion. The 1993 version of this section reads as follows:

§ 23–2–4. Classification of industries; accounts; rate of premiums; prior notice of rate changes; exceptions.

The commissioner shall distribute into groups or classes the employments subject to this chapter, in accordance with the nature of the business and the degree of hazard incident thereto. And the commissioner shall have power, in like manner, to reclassify such industries into groups or classes at any time, and to create additional groups or classes. The commissioner may make necessary expenditures to obtain statistical and other information to establish the classes provided for in this section.

The commissioner shall keep an accurate account of all money or moneys paid or credited to the compensation fund, and of the liability incurred and disbursements made against same; and an accurate account of all money or moneys received from each individual subscriber, and of the liability incurred and disbursements made on account of injuries and death of the employees of each subscriber, and of the receipts and incurred liability of each group or class.

In compensable fatal and total permanent disability cases, other than occupational pneumoconiosis, the amount charged against the employer's account shall be such sum as is estimated to be the average incurred loss of such cases to the fund. The amount charged against the employer's account in compensable occupational pneumoconiosis claims for total permanent disability or for death shall be such sum as is estimated to be the average incurred loss of such occupational pneumoconiosis cases to the fund.

It shall be the duty of the commissioner and the compensation programs performance council to fix and maintain the lowest possible rates of premiums consistent with the maintenance of a solvent workers' compensation fund and the creation and maintenance of a reasonable surplus in each group after providing for the payment to maturity of all liability incurred by reason of injury or death to employees entitled to benefits under the provisions of this chapter. A readjustment of rates shall be

---

ond injury self-insurance status before February 2, 1995, may continue this status if they otherwise meet the statutory qualifications.

**8.** Both EACC and Pine Ridge subscribe to the catastrophe fund; it is not clear whether Weirton Steel subscribes or is self-insured for catastrophe coverage.

made yearly on the first day of July, or at any time the same may be necessary. At such times as the commissioner elects to readjust the base rates for the various industrial classifications, the commissioner shall file a schedule of the readjusted base rates for each industrial class with the office of the secretary of state for publication in the state register pursuant to article two [§ 29A–2–1 et seq.], chapter twenty-nine-a of this code. Such schedule shall be so filed at least thirty days prior to the first day of the quarter to which an adjustment of rates is to be applicable. At such times as the commissioner elects to readjust the individual merit rates for the subscribers to the fund, the commissioner shall provide notice of such merit rate adjustments to the affected employers at least thirty days prior to the first day of the quarter to which an adjustment of rates is to be applicable. The commissioner shall not retroactively increase or decrease rates except in instances of fraud, mistake or reliance upon incorrect information furnished by the employer. The determination of the lowest possible rates of premiums within the meaning hereof and of the existence of any surplus or deficit in the fund shall be predicated solely upon the experience and statistical data compiled from the records and files in the commissioner's office under this and prior workers' compensation laws of this state for the period from the first day of June, one thousand nine hundred thirteen, to the nearest practicable date prior to such adjustment: *Provided,* That any expected future return, in the nature of interest or income from invested funds, shall be predicated upon the average realization from investments to the credit of the compensation fund for the two years next preceding. Any reserves set up for future liabilities and any commutation of benefits shall likewise be predicated solely upon prior experience under this and preceding workers' compensation laws and upon expected realization from investments determined by the respective past periods, as aforesaid.

The commissioner and the compensation programs performance council may fix a rate of premiums applicable alike to all subscribers forming a group or class, and such rates shall be determined from the record of such group or class shown upon the books of the commissioner: *Provided,* That if any group has a sufficient number of employers with considerable difference in their degrees of hazard, the commissioner may fix a rate for each subscriber of such group, such rate to be based upon the subscriber's record on the books of the commissioner for a period not to exceed three years ending the thirty-first day of December of the year preceding the year in which the rate is to be effective; and the liability part of such record shall include such cases as have been acted upon by the commissioner during such three-year period, irrespective of the date the injury was received; and any subscriber in a group so rated, whose record for such period cannot be obtained, shall be given a rate based upon the subscriber's record for any part of such period as may be deemed just and equitable by the commissioner; and the commissioner shall have authority to fix a reasonable minimum and maximum for any group to which this individual method of rating is applied, and to add to the rate determined from the subscriber's record such amount as is necessary to liquidate any deficit in the schedule as to create a reasonable surplus.

It shall be the duty of the commissioner, when the commissioner changes any rate, to notify every employer affected thereby of that fact and of the new rate and when the same takes effect. It shall also be the commissioner's duty to furnish each employer yearly, or more often if requested by the employer, a statement giving the name of each of the employer's employees who were paid for injury and the amounts so paid during the period covered by the statement.

1993 W. Va. Acts Reg. Sess. ch. 171.

The full text of West Virginia Code § 24–2–4, as amended and re-enacted in 1995, is as follows:

§ 23–2–4. Classification of industries; rate of premiums; authority to adopt various systems; accounts.

(a) The commissioner, in conjunction with the compensation programs performance council, is authorized to establish by rule a system for determining the classification and distribution into classes of employers subject to this chapter, a system for determining rates of premium taxes applicable to employers subject to this chapter, a system of multiple policy options with criteria for subscription thereto, and criteria for an annual employer's statement providing both benefits liability information and rate determination information.

(1) In addition, the rule shall provide for, but not be limited to:

(A) Rate adjustments by industry or individual employer, including merit rate adjustments;

(B) Notification regarding rate adjustments prior to the quarter in which the rate adjustments will be in effect;

(C) Chargeability of claims; and

(D) Such further matters that are necessary and consistent with the goals of this chapter;

(2) The rule shall be consistent with the duty of the commissioner and the compensation programs performance council to fix and maintain the lowest possible rates of premium taxes consistent with the maintenance of a solvent workers' compensation fund and the reduction of any deficit that may exist in such fund and in keeping with their fiduciary obligations to the fund;

(3) The rule shall be consistent with generally accepted accounting principles;

(4) The rule shall be consistent with classification and rate-making methodologies found in the insurance industry; and

(5) The rule shall be consistent with the principles of promoting more effective workplace health and safety programs as contained in article two-b [§§ 23–2B–1 et seq.] of this chapter.

(b) Notwithstanding any other provision of this chapter to the contrary, the compensation programs performance council may elect to premise its premium tax determination methodology on the aggregate number of hours worked by employees of the employer rather than upon the gross wages of the employer. Such an election may apply to all industrial classifications or to less than all. If this election is made, then in all instances in which this chapter refers to gross wage reports for the purpose of premium tax determination such references shall be taken to mean a report of the number of hours so worked.

(c) The rule authorized by subsection (a) of this section shall be promulgated on or before the first day of July, one thousand nine hundred ninety-six. Until the rule is finally promulgated the prior provisions of this section as found in chapter one hundred seventy-one of the acts of the Legislature, one thousand nine hundred ninety-three, shall remain in effect.

(d) In accordance with generally accepted accounting principles, the workers' compensation division shall keep an accurate accounting of all money or moneys earned, due, and received by the workers' compensation fund, and of the liability incurred and disbursements made against the same; and an accurate account of all money or moneys earned, due and received from each individual subscriber, and of the liability incurred and disbursements made against the same.

W. Va.Code § 23–2–4 (Repl. Vol. 2002).

The major changes effected by the 1995 amendment of West Virginia Code § 23–2–4 may be separated into three categories. First, the power to fix premiums for workers' compensation coverage was vested in the Commissioner *and the Performance Council,* rather than in the Commissioner alone. Second, omitting several paragraphs of statutory direction for the establishment of such rates, the statute directed the Commissioner, *in conjunction with the Performance Council,* to establish by rule the system for determining premiums, a system of multiple policy options, and criteria for the annual employer's statement of benefit liability and rate determination information, all in accord with legislatively enumerated standards. Significantly, the rule-making power was vested in the Commissioner and Performance Council, free and clear of the usual requirements for legislative rule-making review prior to actual promulgation of the rule. *Cf.* W. Va.Code

§ 21A–3–7(c) *to* W. Va.Code §§ 29A–3–1 to 18. Third, the Legislature removed from its rate-making instructions the direction to fix rates sufficient for the "creation and maintenance of a reasonable surplus in each group after providing for the payment to maturity of all liability incurred by reason of injury or death to employees entitled to benefits under the provisions of this chapter" and inserted the rate-making instruction to fix rates sufficient to effect a "reduction of any deficit that may exist in such fund and in keeping with their fiduciary obligations to the fund . . . ." W. Va.Code §§ 23–2–4 (1993), 23–2–4(a)(2) (1995).

Prior to 1995 the Legislature directed and intended that premiums would be collected sufficient to provide for the payment "to maturity" of all obligations of the Fund, together with "a reasonable surplus" for each group of employers and employees established under the system, including a second injury reserve. However, in 1995 that specific language was deleted and the legislative direction and intention was altered to require, among other things, premiums calculated to permit a "reduction of any deficit that may exist" in the Fund, in apparent realization that the Fund then had not collected premiums sufficient to provide for the payment of liabilities "to maturity," let alone sufficient to provide a reasonable surplus for each grouping developed under the system and a second injury reserve.[9] Testimony before the hearing examiner suggested that a large part of the impetus for requiring the

development of a plan to reduce the Fund's deficit was to improve the bond rating of the state.

In response to the 1995 legislative directives, the Commissioner and Performance Council drafted a proposed rule and proceeded to hold the necessary public hearings. In due course, the "Risk Management Rule" (hereinafter "Rule 9") was promulgated. *See* 85 W. Va.C.S.R. 9. This rule retains the concept of a surplus fund and defines it to include that portion of the workers' compensation fund set aside to cover "the catastrophe hazard, the second injury hazard, *deficit reduction,* and all other losses not otherwise specifically provided for by the Act." *Id.* at § 3.31 (emphasis supplied). In section 7 of Rule 9, the Performance Council is vested with authority to make a series of determinations consistent with its statutory duty "to fix and maintain the lowest possible rates of premium taxes consistent with the maintenance of a *solvent* workers' compensation fund and the *reduction of any deficit that may exist in such fund. . . ." Id.* at § 7.2 (emphasis supplied). The Performance Council is also authorized to include claims costs in "the methodology . . . [it employs] to assess deficit reduction costs, and such other costs pertinent to the determination of required revenues." *Id.* Further, the Performance Council is specifically authorized to "[d]etermine the amount of premium tax which is assessed to reduce any deficit that

---

**9.** One service publisher relates that a 1993 report by the Alliance of American Insurers noted that in 1984 all state workers' compensation funds were solvent. By the end of 1990, however, West Virginia was among six funds which had reported insolvency. CCH Workers' Compensation, Vol. 1 ¶ 5435. The evolution of the deficit is reflected in the Division's annual reports to the governor. In the FY 1990 report, a chart entitled "Operating Expense by Year" reflects that losses first exceeded gains for regular subscriber accounts in FY 1985. The same chart in the FY 1995 Annual Report shows that the operating loss continued for each year during the FY 1985 through FY 1995 period. Another chart reflecting the account balance for the second injury fund for the same period implies a similar result since it shows a consistent annual practice of transferring money to the second injury fund to maintain a fixed account balance. We further note the following percentage fluctuation in the

rates charged during this period according to the actuary for the Fund as reported by Emily A. Spieler in a 1995 law review article entitled *Assessing Fairness in Workers' Compensation Reform: A Commentary on the 1995 West Virginia Workers' Compensation Legislation:*

| Effective Date | Rate (brackets denote decrease) |
| --- | --- |
| 7–1–85 | [30%] |
| 1986 through 1988 | No change |
| 1–1–89 | 30% |
| 7–1–90 | 19% |
| 7–1–91 | 15% |
| 7–1–92 | 3% |
| 7–1–93 | 7% |
| 7–1–94 | No change |
| 7–1–95 | 12.2% |

98 W. Va. L.Rev. 23, 85 n. 199 (1995).

may exist in the workers' compensation fund." *Id.*

After promulgation of Rule 9, the Commissioner and the Performance Council proceeded with the process for the adoption of workers' compensation premiums for FY 1998. Following public hearings at which some adverse comments were received, most notably from self-insured employers, an additional hearing was held for further comment on the proposed FY 1998 premium tax rates. Finally, on May 23, 1997, the Performance Council adopted Resolution No. 11 in which it is essentially stated that the Performance Council approved the FY 1998 premium tax rates as recommended by then Commissioner William F. Viewig.

A feature of Resolution No. 11 adopted by the Performance Council, which is at the heart of the controversy in the appeals before us, is the requirement that employers pay premiums increased in an amount dedicated to the "[a]mortization of [d]iscount." The term "amortization of discount" is, for purposes of this appeal, the amount directed by the Commissioner and Performance Council to be included in the FY 1998 workers' compensation premium tax rates for each employer in the state for the purpose of effecting a perceived "reduction of deficit" in the workers' compensation fund.[10] As the actuary for the workers' compensation fund testified:

> The amortization of the discount represents the amount of investment income that would have been earned on the stated liabilities at the beginning of the period, based on the assumed interest rate.... [A]ssuming the Division collects enough money for prospective coverage, [it] is the amount of money that has to be collected to stop the deficit from increasing just by the missing interest on the discounted liabilities.

The amortization of discount was first allocated between regular subscribers as a class and self-insureds as a class. *See* note 41 for a more detailed explanation. The allocation of the self-insured employer share of the amortization of discount among specific self-insured employers involved a further two-step process. The first step was based upon the number of second injury claims each self-insured employer had in a three-year period; the second step divided among active self-insured employers a share of the claims incurred by inactive self-insured employers.

Upon receipt of the Commissioner's notification of the proposed FY 1998 premium tax rates, including a calculated allocation of the "amortization of discount," Appellants[11] each timely protested the allocation of their share of the "amortization of discount" premium. Their initial protest was filed with the Commissioner as required by statute. *See* W. Va.Code § 23–2–17. The appeals were consolidated, and after hearings before a hearing examiner, the Commissioner by order dated November 30, 2000, upheld the premiums charged each of the Appellants. Appellants sought judicial review of this order in the Circuit Court of Kanawha County.[12] The circuit court in its final order of January 17, 2002, upheld the Commissioner's decision; through this appeal Appellants seek a reversal of the lower court's order.

## II. Standard of Review

Judicial review of the matter at hand is sought pursuant to the Administrative Procedures Act which provides that "[a]ny party adversely affected by the final judgment of the circuit court ... may seek review thereof by appeal to the supreme court of appeals of this state ...." W. Va. Code § 29A–6–1 (1964) (Repl. Vol. 2002). The scope of our review of these cases is summarized in syllabus points one and two of *Wheeling–Pittsburgh Steel Corp. v. Rowing,*

10. Resolution No. 11 and supporting documentation in the record disclose that the final calculation of premiums for FY 1998 included consideration of both the amortization of discount and a component labeled "reduction of deficit" described as a further calculation for an anticipated shortfall in investment income on current investments.

11. Appellants were among the over thirty self-insured employers who sought administrative review of the FY 1998 premiums.

12. In total, six of the initial self-insured employers protesting the premiums sought judicial review of the Commissioner's order in the circuit court.

205 W.Va. 286, 517 S.E.2d 763 (1999), as follows:

 1. Under the West Virginia Administrative Procedures Act, W. Va.Code ch. 29A, appellate review of a circuit court's affirmance of agency action is *de novo*, with any factual findings made by the lower court in connection with alleged procedural defects being reviewed under a clearly erroneous standard.

 2. "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va.Code § 29A–5–4[ ] and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. pt. 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

Of particular relevance to the issues raised by this appeal is the review standard set forth in syllabus point one of *Appalachian Power Co. v. State Tax Dept.*, 195 W.Va. 573, 466 S.E.2d 424 (1995): "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review."

### III. Discussion

Appellants advance several grounds for the reversal of the lower court's affirmance of the administrative order. While not all Appellants advance the same arguments, a fair summary of their collective positions is: (1) the Division violated statutory, regulatory and fiduciary obligations in failing to develop a surplus fund, including a second injury reserve; (2) the method adopted by rule to increase the premium tax by amortizing the discount is at variance with generally accepted accounting principles (hereinafter "GAAP") as well as insurance and actuarial standards, compliance with which is required either by the statute authorizing the rule or proper business standards; (3) the imposi-

tion by the Division of an additional or increased premium tax to amortize the discount or reduce the deficit with respect to self-insured employers contravenes prior decisions of this Court, provisions of the Act, and relevant regulations; (4) the portion of the premium tax designed to amortize the discount or reduce the deficit involves prior second injury life awards and as such is an impermissible retroactive assessment of costs; (5) the additional premium tax represents a violation of federal and state constitutional provisions prohibiting the taking of private property for public use without just compensation; and (6) the increase in premium tax violates the due process clauses of the federal and state constitutions. We consider each of these contentions in turn.

### A. Failure to Maintain Surplus Fund

Appellants are substantially correct when they assert that the Division has failed to maintain a surplus fund, as described in West Virginia Code § 23–2–4, before the adoption of the 1995 amendments. While the Fund has, at least until relatively recently, had an accumulation of assets for future payment of claims, the longstanding practice for computing premiums was not in compliance with the expressed legislative intent of building a surplus sufficient to provide for the payment to maturity of all liability incurred by reason of injury or death of covered employees, *including* a reserve for life awards in second injury cases. The Division does not dispute this point.[13]

The record further reflects that it has not been until rather recently that efforts have been made to actuarially compute the value of awards made at a given point in time with regard to the liability for future payments. The record discloses that the actuarially indicated estimate of the total of future payments due on all open claims at the time the FY 1998 rates were being determined was calculated at $6 billion and the actuarially determined present value of that sum is ap-

---

**13.** Appearing in the record as Joint Stipulation No. 14 is the following: "The Surplus Fund, including the Second Injury Reserve, is not now, nor is the Respondent [West Virginia Bureau of Employment Programs, Workers Compensation Division] aware that it has ever been maintained

as a separate account." Although physically not separated from the other assets, our review of the annual reports through 1998 reflect that separate accounting entries were maintained with regard to the second injury fund.

proximated at $2.2 billion, considerably less than the assets maintained in the Fund over a number of years. We further understand from the record that the dollar amount of the amortization of the discount is roughly $3.8 billion, which is the difference between the actuarially determined undiscounted sum of $6 billion and the discounted or present value sum of $2.2 billion. Through the FY 1998 premium tax assessments, the Commissioner and Performance Council proposed to recoup the first annual installment [14] of this sum.[15]

Against this historical backdrop, we recognize that the fundamental issue raised through this appeal is whether Appellants and others similarly situated, be they self-insured employers as to all workers' compensation risks or not, may be required to contribute to the reduction of this actuarially determined deficit in the workers' compensation fund in the manner devised by the Legislature through its 1995 amendment and reenactment of West Virginia Code § 23-2-4, and by the Commissioner and the Performance Council both in their promulgation of Rule 9 and adoption of Resolution No. 11. In resolving this issue, we address the various arguments raised by the parties to this appeal.

### B. GAAP and Insurance Industry and Actuarial Standards

Appellants claim that in the process of rule making and increasing the premiums to reduce the deficit, the Commissioner and Performance Council failed to comply with the legislative directive that the rule be consistent with "generally accepted accounting principles" and "classification and rate-making methodologies found in the insurance industry." W. Va.Code § 23-2-4(a)(3) and (4). The cornerstone of Appellants' argument is that insurance industry rate-making undertakes to foretell future risks rather than to recover a deficit due to inadequate rates

charged in the past. While this argument has allure on first blush, it loses much of its attraction on closer examination. Common experience tells us that insurance rate-making takes into account multiple factors including an insured's past loss record, past experience with the class in which an insured is placed, past profitability of the line of insurance, investment profits, asset valuations, overall company profitability, as well as other relevant elements. Recent events in the state have heightened our awareness of the fact that if an insurer is of the opinion that a profit has not or cannot be made, the insurer may apply for weighty premium increases to satisfy these factors or elect to withdraw from a given line of insurance or elect to discontinue offering a particular type of coverage. These alternatives are obviously solutions which are not available to the Commissioner and Performance Council.

The most serious shortcoming in Appellants' argument concerning accounting principles and insurance standards is its overemphasis on the subsidiary processes rather than the primary goal of the rate-making statute. Appellants insist that the legislative requirements placed on the Performance Council and Commissioner to employ GAAP, as well as insurance industry and actuarial standards, operate to prohibit collection of any portion of the amortization of discount from self-insured employers. In light of the contrasting deficit reduction language, that reading of West Virginia Code § 23-2-4 suggests an ambiguity as to its meaning, causing us to construe the statute before it can be applied. Syl. pt. 1, *Farley v. Buckalew*, 186 W.Va. 693, 414 S.E.2d 454 (1992). In so doing, we are mindful that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. Pt. 1, *Smith v. State*

---

**14.** The record indicates that the portion of the amortization of discount attributable to FY 1998 is $216 million.

**15.** We note here that the parties sometimes characterize the annual installment of the amortization of discount as not increasing the deficit or as attempting to recover the lost investment opportunity arising from the Fund being, in the long run, about $6 billion short of being fully funded.

In any event, that portion of the $6 billion shortfall characterized as the amortization of discount is based on actuarial assumptions which essentially are educated guesses about such things as periodic asset valuations, assumed interest rates, estimated life expectancies and the like. We recognize that the conclusions drawn from such assumptions do not provide absolutely certain dollar figures.

*Workmen's Comp. Com'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975). " 'In ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation.' Syl. Pt. 2, *Smith v. State Workmen's Compensation* Commissioner, 159 W.Va. 108, 219 S.E.2d 361 (1975)." *State ex rel. Morgan v. Trent,* 195 W.Va. 257, 263, 465 S.E.2d 257, 263 (1995) (*quoting State ex rel. Fetters v. Hott,* 173 W.Va. 502, 318 S.E.2d 446 (1984)).

A central feature of the 1995 amendment to West Virginia Code § 23–2–4(a)(2) is the Legislature's express direction to the Commissioner and Performance Council to develop a rule which is aimed at establishing rates "consistent with the maintenance of a *solvent* workers' compensation fund and the *reduction of any deficit that may exist in such fund....*" As noted earlier, the reduction of deficit language replaced language of previous enactments which required that a surplus fund be established and maintained. Surely we would be reaching an absurd result if we found that, by structuring the rule making and rate-making process around strict adherence to business and accounting principles, the Legislature intended that its own directive to correct "any deficit" be defeated. As we have long held, "[w]here a particular construction of a statute would result in an absurdity, some other reasonable construction, which will not produce such absurdity, will be made." Syl. pt. 2, *Newhart v. Pennybacker,* 120 W.Va. 774, 200 S.E. 350 (1938). This Court is required to attempt to give meaning to all of the words in a statute and not to excise or negate any language if seemingly inconsistent language can be reconciled. Syl. pt. 7, *Ex parte Watson,* 82 W.Va. 201, 95 S.E. 648 (1918). In the circumstances before us, we are satisfied that the Legislature, by its amendment and reenactment of West Virginia Code § 23–2–4 in 1995, intended sound actuarial, insurance industry standards and business practices be employed in the determination of workers' compensation premium rates, but clearly did not intend that language to negate the Legislature's efforts to reduce any deficit in the workers' compensation fund. Our conclusion is further influenced by the Legislature's

seeming acquiescence to the rate-making methodology used in 1998, since further legislative amendment has not been made to these rate-making directives or the broad grant of rule-making power to the Performance Council after the methodology was employed. *See Appalachian Power Co. v. State Tax Dept.,* 195 W.Va. 573, 593, 466 S.E.2d 424, 444 (1995).

Finally, we are satisfied that the record before us established that the Performance Council and Commissioner conformed to the legislative directives to employ appropriate business and actuarial standards in their rate-making processes. It has not been until recent times that actuarial standards and GAAP have been introduced into this state's workers' compensation rate-making process, as evidenced by the annual reports of the Division in fiscal years 1989 and 1990. In the FY 1998 rate-making process, we note specifically the extensive recourse to actuarial considerations and the reliance by the Performance Council and Commissioner on the results of the micro insurance reserve analysis process. From the record before us, we simply cannot say that the processes utilized failed to take into account all legislatively prescribed standards expressed in the 1995 amendments to the Act for the formulation of the rule or its application to the rate-making process.

Our observations are made in full recognition of the fact that actuarial standards may yield higher or lower estimates of future obligations and so-called unfunded liabilities, depending upon the assumptions underlying the estimates. These assumptions include such variables as future returns on investments, valuation methods for investments, length of life awards, fluctuations in the average annual wage in West Virginia and other analogous factors. In the case before us, the parties did not challenge the assumptions and actuarial conclusions underpinning the calculation of the amortization of the discount. Consequently, we accept those calculations in the instant case as reasonably accurate for the purposes for which they were utilized.

## C. Claim that Court Decisions and Provisions of the Act Exempt Appellants

Appellants point to several decisions of this Court [16] in which we addressed the purpose of the so-called second injury fund and held that second injury life awards must be charged to and paid by the Commissioner and not be charged to the employer. As germane as these cases may appear to be, they were decided under facts and circumstances unlike those presently before us and provide no substantive guidance in the instant case. Each of these decisions presumes the presence of a surplus fund and, by implication, the second injury reserve. Because these cases were decided well in advance of the statutory developments at issue, they do not address the critical issues giving rise to this action or the 1995 statutory amendments directing the "reduction of any deficit," and are thus inapposite. W. Va. Code § 23-2-4.

■ More enlightening points are raised by Appellants regarding seemingly conflicting provisions of the Act. Appellants contend that separate sections of the Act preclude self-insured employers from being assessed amortization of discount charges as part of the deficit reduction plan because the Legislature (1) denoted the particular elements to be included in premium computations for self-insured employers,[17] and (2) provided directly and indirectly that no other charges be levied against any self-insured employers with respect to second injuries.[18] Appellants stress that their position is bolstered by the Legislature's failure to revise the Act, either in 1995 or to date, so as to unequivocally authorize or require participation of self-insured employers in the deficit reduction process.

In response, the Division contends that the authority to include self-insured employers in the deficit reduction plan is reflected in the first component of the premium tax calculation for self-insured employers in West Virginia Code § 23-2-9(b)(1), which reads: "A sum sufficient to pay the employer's proper portion of the expense of the administration of this chapter." The Division submits that, to the extent that the conflict Appellants maintain exists among various provisions of the Act, it can be resolved when West Virginia Code §§ 23-1-1(a), 23-2-5(g) are read in pari materia with West Virginia Code § 23-2-9.

■ At the outset, we observe that the phrase "expense of the administration of this chapter" is not, nor has it ever been,[19] defined within the Act. W. Va.Code § 23-2-9(b)(1). While historic application of the phrase to self-insured employers' premium rates has only included the routine management costs of the Division, we must look to see if the 1995 amendments to West Virginia Code § 23-2-4 regarding general rate-making authority allows the definition of the term to be broadened with respect to self-insured employer premium tax rates. There is no question that the Legislature failed in 1995 to make parallel amendments between the general rate-making section and the self-insured employer premium tax section of the Act and that this failure gives rise to ambiguity in the overall statutory scheme for such rate-making. When faced with interpreting multiple statutory provisions, this Court has maintained that:

> Statutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in *pari materia* to assure recognition and implementation of the legislative intent. Accordingly, a court should not limit its consideration to any single part, provision, section, sentence, phrase or word, but rather review the act or statute in its

---

**16.** *Cardwell v. State Workmen's Compensation Com'r*, 171 W.Va. 700, 301 S.E.2d 790 (1983); *McClanahan v. Workmen's Compensation Com'r*, 158 W.Va. 161, 207 S.E.2d 184 (1974); *Gillispie v. State Workmen's Compensation Com'r*, 157 W.Va. 829, 205 S.E.2d 164 (1974).

**17.** W.Va.Code § 23-2-9(b).

**18.** W.Va.Code §§ 23-3-1(d), 23-2-9(e)(3).

**19.** The requirement that self-insured employers pay a portion of the expense of the administration of Chapter 23 first appeared in the Act in 1915. *See* 1915 W.Va. Acts Ex. Sess. ch. 1, § 54.

entirety to ascertain legislative intent properly.

Syl. Pt. 5, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W.Va. 14, 217 S.E.2d 907 (1975).

The Division suggests that the concept of administration in West Virginia Code § 23-2-9 extends to administration of the entire chapter and should be read broadly to include all duties and obligations directed by the Act. West Virginia Code § 23-1-1(a) provides that "[t]he commissioner of the bureau of employment programs ... has the sole responsibility for the administration of this chapter except for such matters as are entrusted to the ... performance council." In addition to duties such as participating in the rate-making process, the Commissioner also has the obligation under Chapter 23 to make claims payments to all injured workers whose benefits are in fact not paid. Such obligation includes payment of benefits to employees of former and current subscribing employers who did not make adequate payments or have gone out of business, as well as employees of self-insured employers that are unable to pay the benefits from their resources and have not secured sufficient bonding or have gone out of business without having made adequate provision for maturing claims. *See* W. Va.Code § 23-2-5(g). According to the terms of West Virginia Code §§ 23-1-1 and 23-2-5(g), "administration of this chapter" embraces not only routine management expenses such as personnel, travel and supplies, but also provision for the payment of benefits as they mature to all qualifying injured employees. In this sense, premium taxes imposed have to include allowances for the inability of subscribing or self-insured employers to pay benefits. Consequently, barring express legislative exclusion to the contrary, the itemization of "the expense of the administration of this chapter" as a component of the workers' compensation premium tax rate that may be levied against self-insured employers may include provision for maturing benefits, which are required by law to be paid by the Commissioner when an employer defaults or otherwise is unable to meet its obligation, as part of the cost or expense of administering Chapter 23. *See* W. Va.Code § 23-2-9(b)(1).

▌ In arriving at this conclusion, we are mindful that our review of an agency's construction of the statute it administers as reflected in a rule promulgated by that agency is limited and this Court does not have free reign to substitute its preferred construction of the statute for that of the agency. Syl. Pt. 4, *Appalachian Power Co. v. State Tax Dept.*, 195 W.Va. at 579, 466 S.E.2d at 430. In cases where an agency's governing statute is silent or ambiguous with respect to a specific issue, this Court shows substantial deference to the agency's construction as reflected in a rule or regulation, or application thereof, unless the agency has exceeded its constitutional or statutory authority or has acted arbitrarily or capriciously. *Frymier-Halloran v. Paige*, 193 W.Va. 687, 694, 458 S.E.2d 780, 787 (1995) (stating that "courts will not override administrative agency decisions, of whatever kind, unless the decisions contradict some explicit constitutional provision or right, are the results of a flawed process, or are either fundamentally unfair or arbitrary").

Our examination of the record reveals that the hearing examiner properly found that the agency acted within the limits of statutory authority and valid reasoning. The hearing examiner specifically said that:

The Commissioner in the administration of this chapter must, by mandate, keep a solvent fund and reduce the deficit. Thus, the Commissioner must be granted the authority pursuant to said duty of administration, to reduce the deficit. Amortization of discount is the number that keeps the deficit from growing. Thus, the administrative responsibility of keeping the deficit from growing, is represented in amortization of the discount, which was properly defined as an appropriate "expense of administration". Authority for this rationale[ ] is found in West Virginia Code Section[s] 23-2-4, 23-2-9 and 85 CSR 9.[20]

---

**20.** Although the hearing examiner did not expressly reference his reliance on West Virginia

Code § 23-1-1, it is clear that this statement was

We are not swayed by Appellants' argument that amortization of the discount cannot be an administrative charge because it is not mentioned in the pertinent regulations addressing the components of administrative charges. Initially, we observe that the regulation [21] and underlying statute [22] on which Appellants rely were not adopted in the face of a looming and growing deficit in the overall workers' compensation fund which the Legislature chose to address in its 1995 amendments to the Act. The dominant message conveyed by the Legislature in 1995 to the Commissioner and Performance Council regarding the rate-making process was to address the workers' compensation fund deficit. The Legislature is entitled to substantial latitude in dealing with the deficit problem. Again we note that the Legislature has met in plenary session on at least five occasions since this rate-making methodology was employed and has not prohibited or otherwise altered the allocation of a portion of the amortized discount to self-insured employers. The record discloses that what constitutes the cost of administration with regard to workers' compensation systems varies from state to state and is dependent upon the duties of the administrator of the Fund. This fact, along with the recognition that there are considerable statutory and structural differences among the workers' compensation programs of the states, make it difficult to arrive at a generally accepted definition of cost of administration. Nonetheless, we find guidance in the interpretation Ohio has accorded to the phrase "cost of administration" because Ohio operates a system structured similarly to West Virginia's. In *State ex rel. Fulton Foundry & Mach. Co. v. Morse*, 101 Ohio App. 258, 140 N.E.2d 49 (1956), an Ohio appellate court found that the phrase "cost of administration" in the context of its workers' compensation law means costs "incident to

the duties and performance of the activities of the commission." [23] *Id.* at 55.

Additional evidence bearing on this issue was introduced through testimony before the hearing examiner that administrative charges in Kentucky and Rhode Island include expenses other than the expenses associated directly with the management of the system. Examples of such items charged as administrative expenses were assessments for a closed second injury fund and cost-of-living increases for previously injured workers. As to Kentucky's second injury fund, the actuary for the Division testified: "The fund was closed to claims ... [where] last exposure [occurred] beyond December 12, 1996, but the fund is still in operation and accepting new claims if they are from exposures prior to that date." He went on to explain how the Kentucky statute [24] directs that monies to pay the claims, including unfunded liabilities, be obtained by stating:

> All employers in the state are assessed, the last number I saw was, nine percent of [their] premium, their Workers' Comp. premium. If they are self-insured, they are assessed nine percent of what the state says their premium would be if they were insured.... It is not based on actuarial principles, in that you have employers, for example, who are new to the state and had no exposure prior to 12/12/96, who must pay assessments to the Kentucky Special Fund. They did not participate in the risk pool. They get no direct benefits from the payments by the fund.

In consideration of the legislative failure to alter the practice of including the amortization of the discount as a factor in calculating the premiums of self-insured employers as well as the referenced practices of Ohio, Kentucky and Rhode Island, we find that alloca-

---

implicitly made with reference to the statutory responsibility imposed upon the Commissioner.

21. 85 W.Va.C.S.R. 9 § 13.13.c.A.

22. W.Va.Code § 23-2-9.

23. Although in a different context, this Court had occasion in *Contractors Ass'n of West Virginia v. West Virginia Dept. of Public Safety, Division of Public Safety*, 189 W.Va. 685, 434 S.E.2d 357

(1993), to address what constitutes administrative costs with respect to a state agency and stated: "common sense allows us to conclude that the clause 'cost of administration' in *W. Va. Const.* art. VI, § 52 means the cost of administering the *duties* of the Division of Motor Vehicles." (Emphasis supplied.) 189 W. Va. at 691, 434 S.E.2d at 363.

24. *See* Ky.Rev.Stat. Ann. § 342.122 (Michie 1997).

tion of a portion of the amortization of discount to self-insured employers is properly included as a part of the expense of administration of the workers' compensation fund, in conformance with the rate-making provisions of Title 85, Series 9 of the West Virginia Code of State Regulations and the standards prescribed by the Legislature.

Despite Appellants' protestations, we are not convinced that the provisions of West Virginia Code §§ 23–3–1(d) and 23–2–9(e)(3) negate such a reading. These provisions relate to limiting charges against employers for second injury life award payments to their individual employees. We reach this conclusion, as more fully developed below, based on our opinion that the methodology adopted to calculate self-insured premium taxes addressed reducing the overall deficit or unfunded liability of the entire workers' compensation system. While we cannot explain the Legislature's failure to amend these statutory provisions concurrent with the amendment and reenactment of West Virginia Code § 23–2–4(a)(2), we conclude that the failure of the Legislature to prevent the continuing assessment of the amortization of the discount factor supports our conclusion.

### D. Additional Tax to Amortize the Discount as Retroactive Cost

Properly understood, the portion of the annual assessment referred to as amortization of the discount is intended to replace, in the fiscal year in which it is collected, the income potential in that year of assets not on hand because premium taxes in prior years were inadequate to meet anticipated obligations. Some portion of the additional tax has been assessed on each participating employer in the state, including employers subscribing to the Fund as well as those which are self-insured, regardless of whether an employer has ever had benefits awarded to its employees. The additional tax may arguably be seen as an unfair assessment on employers who may not have directly contributed to the unfunded liability problem. However, clearly seen in another light, the tax to amortize the discount is a current cost to administer the Fund for the benefit of all past and present participating employers and

covered employees. In this sense, the additional tax is a current cost.

Appellants' contention that it is impermissible for the additional tax to be applied to self-insured employers because it allows the Division to recoup second injury life award payments is not supported by the record. While the financial problems of the Division necessarily include the second injury fund, the additional tax to amortize the discount is not directly correlated to second injury life awards. The need to amortize the discount does not arise solely by reason of historical conditions and causes that are attributable to current and former employers classified as self-insured, but also includes such conditions and causes involving employers who are not self-insured. The overarching reality is that the workers' compensation system is a comprehensive remedy for workplace injuries and diseases which permeates virtually every employment situation in the state and under which the workers' compensation fund is ultimately responsible for every claim and benefit provided under the law. Accordingly, the Fund carries every burden dropped or avoided by *any* under-assessed, non-paying, closed, failed or bankrupt employer, save the extent to which surety bonds of self-insured employers alleviate this burden. It is readily apparent that, given the ever-changing nature of the state's economy, much of the high-employment, high-wage industrial economy has ceased to exist, but the workers' compensation fund has not kept pace with those changes.

Status as a self-insured employer is a privilege by which a qualifying employer is excused from payment of the full premium tax based upon the employer's representation that a sufficient bond is being posted to defray all future obligations of the Fund which result from that employer's activities. It is telling that the Legislature chose not to exclude self-insured employers from the directive that rates be fixed to maintain a solvent workers' compensation fund and to reduce any deficit in that Fund by specifying that the "system for determining rates of premium taxes [be] applicable to *employers subject to this chapter.*" W. Va.Code § 23–2–4(a) (emphasis added). It is reasonable to

conclude that the Legislature thus intended that part of the cost associated with an employer maintaining the privilege to self-insure was inclusion of such employers in the deficit reduction plan. This conclusion is further supported by the evidence in this case which indicates that over a lengthy period of time self-insured employer security bond requirements have not been stringently enforced, resulting in expanded liability being placed on the Fund for these unsecured obligations.[25] While the Legislature cannot at any point in time forecast which employers operating in the state may in the future be under-assessed, non-paying, closed, failed or bankrupt employers, it would be improper for this Court to attempt to curb the reasonable discretion of the Legislature to address the consequences of some employers inevitably falling into these classifications.

█ The need to increase premium taxes has been influenced by numerous factors. As previously mentioned, under-assessed, non-paying, closed, failed or bankrupt employers contribute to the financial situation under discussion. The reduction or capping of premium rates which has occurred on occasion, presumably for the purpose of encouraging economic development or of fostering the continuation of existing businesses, also has exacerbated the financial problems of the system.[26] The practice of capping premiums, which was used in determining the FY 1998 rates according to Resolution No. 11, not only has financial implications but also obviously diminishes the correlation between the premiums charged and the job-related injury experience of the employer. Benefits payable under particular court decisions may well not have been anticipated in fixing rates in particular years. Likewise, escalating health care costs, especially in recent years, may not have been anticipated in fixing rates at a level necessary to secure future benefit payments. Certainly, fluctuations in the valuation of assets and in rates of return on those assets are considerable factors. Although not exhaustive, the enumerated conditions are sufficient to demonstrate that many employers, subscribing or self-insured, may not have made any direct contribution to the Funds' financial woes. Despite that appearance, the record simply does not support the conclusion that self-insured employers must be excluded from the obligation to address the deficit. Whether by reason of artificially reduced or capped premiums, business closures, reduced bonding requirements or other causes, self-insured employers—like other employers whose employees may have made little or no call on the resources of the Fund—may reasonably be called upon to assist in the reduction of the deficit, represented in this case as the amortization of discount. The stark reality is that the future health of the Fund is at stake, posing a significant threat to the interests of all employers and employees in the state. We continue to recognize as we did in syllabus point three of *Repass v. Workers' Compensation Division*, 212 W.Va. 86, 569 S.E.2d 162 (2002), that:

> The ultimate responsibility for the fiscal health of the West Virginia Workers' Compensation system rests with the Legislature. Balancing the conflicting goals of minimizing premiums while providing full and fair compensation to injured workers is the exclusive province of our publicly elected legislators. . . .

As this Court aptly summarized in *State ex rel. Blankenship v. Richardson*, 196 W.Va. 726, 731, 474 S.E.2d 906, 911(1996):

> [T]his Court is not concerned with the legislative policy which motivated the en-

**25.** The bankruptcy action filed on May 19, 2003, by Weirton Steel in the United States Bankruptcy Court for the Northern District of West Virginia supplies a timely and pertinent example. As stated in a motion filed by Weirton Steel in that action, "The State of West Virginia has calculated, on an actuarial basis, Weirton's security obligation to the [Workers' Compensation] Fund in the amount of approximately $7,109,144 for prospective liability and approximately $40,470,515 for retrospective liability. Frontier Insurance Company has issued a surety bond in the amount of $10,629,496 on behalf of Weirton for the benefit of the State of West Virginia and the Fund. Notwithstanding the security deficit, the State of West Virginia has determined that Weirton is eligible to participate in the State's workers' compensation self-insurance program."

**26.** Either reductions in premiums or capping of premiums has occurred in the past at the behest of at least three recent governors.

actment of ... [the 1995 amendments to the workers' compensation act], nor do we "sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the legislature to consider facts, establish policy, and embody that policy in legislation." *Boyd v. Merritt,* 177 W.Va. 472, 474, 354 S.E.2d 106, 108 (1986).

In our view, the imposition on all employers of additional premium taxes to amortize the discount does not represent a prohibited retroactive charge imposed upon self-insured or other employers subject to the Act. As we recognized over fifty years ago in *Hereford v. Meek,* 132 W.Va. 373, 52 S.E.2d 740 (1949):

> Though the Legislature, in enacting ... [an] amendment may not have realized or foreseen the result of its action ..., it is presumed to be familiar with "all existing law" ... applicable to the subject matter .... If its exercise of ... power cause[s] an undesirable result, the remedy lies with the Legislature, whose action has produced it, and not the courts. The question of dealing with the situation in a more satisfactory or desirable manner is a matter of policy which calls for legislative, not judicial, action.

*Id.* at 388, 52 S.E.2d at 748 (internal citation omitted).

Having fully addressed the non-constitutional challenges involving the premium costs at issue, we now consider Appellants' arguments that the inclusion of the amortization of the discount factor amounts to an unlawful taking and is in violation of their substantive rights of due process.

### E. Unlawful Taking

Appellants maintain that the challenged premium assessments are an impermissible taking in violation of both the federal and state constitutions. *See* U.S. Const. amend. V; W.Va. Const. art. III, § 9.[27] According to Appellants, the Division's actions in charging them additional costs for the purpose of amortizing the discount constitute a regulatory "taking" without just compensation. *See id.* As support for this argument, Appellants rely primarily on the decisions reached by the United States Supreme Court in *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) and the Fifth Circuit Court of Appeals in *U.S. Fidelity & Guaranty Co. v. McKeithen,* 226 F.3d 412 (5th Cir.2000). Neither *Eastern Enterprises* nor *McKeithen,* however, compel the conclusion that the additional premium costs at issue constitute an unconstitutional taking.

#### 1. *Eastern Enterprises*

At issue in *Eastern Enterprises* was the application of certain provisions of the Coal Industry Retiree Health Benefit Act ("Coal Act")[28] that assigned retired coal miners to former coal operators under a complex funding formula designed to address the provision of health benefits to so called "orphan" retirees.[29] 524 U.S. at 511–16, 118 S.Ct. 2131. Admittedly, the *Eastern Enterprises* decision does, in the four-justice plurality section of the sharply divided opinion, contain a discussion of regulatory takings. *See* 524 U.S. at 522–38, 118 S.Ct. 2131. Critically, however, because Justice Kennedy concurred *only* in the result reached by the plurality—the unconstitutionality of the Coal Act as applied to Eastern—and *not* in the plurality's reasoning that an unconstitutional taking resulted, the value of the Takings Clause analysis has come under considerable and well-deserved scrutiny. Based on the fact that Justice Kennedy found the Coal Act unconstitutional solely on substantive due process grounds,[30] there is uniform

---

**27.** The federal constitution provides that: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Similarly, the West Virginia Constitution mandates that: "Private property shall not be taken or damaged for public use, without just compensation[.]" W.Va. Const. art. III, § 9.

**28.** *See* 26 U.S.C. §§ 9701 to 9722 (1992).

**29.** The "orphaning" resulted when the coal employers for whom these retired employees last worked prior to their retirement were no longer contributing to the system due to their withdrawal from the business of coal mining. The assignment of specific employees to an employer was based on the fact that those employees were at some point in the employee's career in the assigned employer's workforce.

**30.** This conclusion was based upon concerns rooted in the severe retroactivity of the provisions of the Coal Act under scrutiny. *See Eastern Enterprises,* 524 U.S. at 547–50, 118 S.Ct. 2131

agreement regarding the limited reach of the *Eastern Enterprises* decision: "[T]he only binding aspect of *Eastern Enterprises* is its specific result—holding the Coal Act unconstitutional as applied to Eastern Enterprises." *Assn. of Bituminous Contrs., Inc. v. Apfel,* 156 F.3d 1246, 1255 (D.C.Cir. 1998); *accord Commonwealth Edison Co. v. United States,* 46 Fed. Cl. 29, 39 (2000) (stating that "no part of the plurality's reasoning constitutes binding precedent"); *Unity Real Estate Co. v. Hudson,* 178 F.3d 649, 658 (3d Cir.1999) (noting that the "splintered" decision in *Eastern Enterprises* "makes it difficult to distill a guiding principle"); *Asarco Inc. v. Dept. of Ecology,* 145 Wash.2d 750, 43 P.3d 471, 476 n. 9 (2002) (observing that "[t]he federal courts applying *Eastern Enterprises* in subsequent cases have overwhelmingly found it did not articulate binding principles of law"); John Decker Bristow, student author, *Eastern Enterprises v. Apfel: Is the Court One Step Closer to Unraveling the Takings and Due Process Clauses?,* 77 N.C. L.Rev. 1525, 1526–27 (1999) (commenting that "the actual holding in *Eastern Enterprises* is quite narrow").[31]

In similar fashion, the Fourth Circuit Court of Appeals has recognized that "*Eastern Enterprises* does not stand for the legal proposition that the Eastern assignments under the Coal Act contravene the Takings Clause."[32] *A.T. Massey Coal Co. v. Massanari,* 305 F.3d 226, 237 n. 17 (4th Cir.2002). Given the high court's lack of consensus, the Fourth Circuit resolved that it would "apply *Eastern Enterprises* only to coal operators that stand in a position substantially identical to that of Eastern."[33] *Ibid.; accord Unity Real Estate,* 178 F.3d at 659. To determine whether the A.T. Massey Coal operators were in a position "substantially identical" to that of the Eastern operators, the Fourth Circuit sought to identify those "factors that were critical to both the plurality and Justice Kennedy in their respective determinations" that requiring Eastern, as a former coal operator, to be responsible for funding health benefits for certain retired miners was unconstitutional. 305 F.3d at 237.

In finding the allocation of retroactive responsibility[34] for health benefits unconstitutional in *Eastern Enterprises,* both the plurality and Justice Kennedy placed significance on the fact that "[n]ot until 1974 ... could lifetime medical benefits ... have been viewed [by the affected coal miners] as promised." 524 U.S. at 535, 118 S.Ct. 2131; *accord* 524 U.S. at 550, 118 S.Ct. 2131 (Kennedy, J., concurring in judgment, dissenting in part). Because Eastern had left the coal industry in 1965, it had never been a signatory to any national bituminous coal wage agreement that carried the implied promise of lifetime health benefits for miners. *See* 524 U.S. at 530–32, 118 S.Ct. 2131; 524 U.S. at 550, 118 S.Ct. 2131 (Kennedy, J., concurring in judgment, dissenting in part) (observing that expectation of lifetime health benefits "was created by promises and agreements made long after Eastern left the coal business"). Consequently, "Eastern could not have contem-

---

(Kennedy, J., concurring in judgment, dissenting in part).

**31.** The student author posits that when Justice Kennedy's separate opinion is read along with Justice Breyer's dissent, five justices arguably concur that "because the Coal Act was a purely economic regulation, the appropriate analysis was provided by the Due Process Clause and not the Takings Clause." Bristow, *supra,* 77 N.C. L.Rev. at 1527.

**32.** The Court in Asarco observed that "the concurrence [Justice Kennedy] and four dissenters in *Eastern Enterprises* were persuaded no taking had occurred because a specific property right or interest in a particular piece of property was not at stake." 43 P.3d at 486.

**33.** The Fourth Circuit, applying the rule of *Marks v. U.S.,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), examined the *Eastern Enterprises* decision to determine whether a "common denominator" could be identified between the concurrence of Justice Kennedy and the plurality for the purpose of determining a controlling holding. After completing the *Marks* analysis, the court concluded that there was "no theoretical overlap between the rationales employed" by the respective judicial authors. *Massanari,* 305 F.3d at 236–37.

**34.** The retroactive reach of the benefits at issue in *Eastern Enterprises* was thirty to fifty years as Eastern was assigned funding responsibility for its employment of coal miners between the years of 1946 and 1965. *See* 524 U.S. at 501, 118 S.Ct. 2131.

plated liability for the provision of lifetime benefits to the widows of deceased miners" before 1974, when it was no longer in the business of coal mining.[35] 524 U.S. at 531, 524 U.S. 498.

Recognizing the substantial amount of Eastern's liability ($50–$100 million), the plurality in *Eastern Enterprises*, observed that "[t]he distance into the past the Act reaches back to impose a liability on Eastern and the magnitude of that liability raise substantial questions of fairness." 524 U.S. at 534, 118 S.Ct. 2131. Refraining from second guessing the wisdom of Congress' decision to enact the Coal Act, however, the plurality reasoned:

> That Congress sought a legislative remedy for what it perceived to be a grave problem in the funding of retired coal miners' health benefits is understandable; complex problems of that sort typically call for a legislative solution. *When, however, that solution singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused, the governmental action implicates fundamental principles of fairness underlying the Takings Clause. Eastern cannot be forced to bear the expense of lifetime health benefits for miners based on its activities decades before those benefits were promised.*

524 U.S. at 537, 118 S.Ct. 2131 (emphasis supplied).

■ Applying principles of substantive due process[36] rather than the Takings Clause, Justice Kennedy similarly concluded that the retroactive reach of the Coal Act was unconstitutional. In contrast to economic legislation that is limited to a prospective application and which "carries with it the presumption of constitutionality," Justice

Kennedy remarked upon "our legal tradition's disfavor of retroactive economic legislation." 524 U.S. at 547–48, 118 S.Ct. 2131 (Kennedy, J., concurring in judgment, dissenting in part). Characterizing the Coal Act's imposition of liability on employers based on events that took place thirty-five years ago as "severe retroactive legislation" and noting that such legislation was of "unprecedented scope" in its reach, Justice Kennedy determined that the specific circumstances present in *Eastern Enterprises*[37] were egregious and presented that "rare instance[ ] in which even such a permissive standard [deferential review accorded to substantive due process challenges of economic legislation] has been violated." 524 U.S. at 549–550, 118 S.Ct. 2131 (Kennedy, J., concurring in judgment, dissenting in part).

Distilling its analysis of the factors common to both the plurality and Justice Kennedy's concurrence, the Fourth Circuit determined that, for purposes of applying the *Eastern Enterprises* decision, "a coal operator stands in a position 'substantially identical' to that of Eastern if it had no connection to the 1974 or subsequent NBCWAs [national bituminous coal wage agreements]." 305 F.3d at 237. While the Massey plaintiffs argued that since they never signed the 1974 or subsequent national bituminous coal wage agreements they were in the same position as Eastern, the Fourth Circuit disagreed, citing the "related persons" status of the Massey plaintiffs with respect to signatory coal operators under the Coal Act. Based upon the clear Congressional intention to treat "related persons" "as though ...[each member of a controlled group of corporations] had employed every miner who worked for any member of the group," the Fourth Circuit determined that the non-signatory status of the plaintiff Massey companies to

**35.** The high court dismissed as irrelevant the fact that Eastern's wholly-owned subsidiary continued mining until 1987, observing that "Eastern's liability under the Act bears no relationship to its ownership of EACC." 524 U.S. at 530, 118 S.Ct. 2131.

**36.** In analyzing legislation under substantive due process principles, the inquiry is whether the legislature, in enacting the retroactive law, acted in an arbitrary and irrational way. 524 U.S. at

547, 118 S.Ct. 2131 (Kennedy, J., concurring in judgment, dissenting in part) (citing *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)).

**37.** Those circumstances included the lack of Eastern's responsibility for the former employees' expectation of lifetime health benefits and for the resulting chaos in the funding mechanism caused by numerous employers exiting the coal business.

either the 1974 or any subsequent national bituminous coal wage agreement did not prevent the application of the Coal Act provisions. *Id.* at 239. In finding that the Massey plaintiffs were not in a "substantially identical" situation to that presented in *Eastern Enterprises,* the Fourth Circuit noted that, just as the United States Supreme Court recognized its obligation to defer to the Congressional statutory definitions in *Eastern Enterprises,*[38] it was similarly required to rely on Congress' decision to designate " 'related persons' as a single legal entity under the Coal Act." *Id.* at 240.

## 2. *McKeithen Decision*

In *McKeithen,* various provisions of a Louisiana statute that addressed funding of the state's second injury fund were challenged as unconstitutional under the Takings Clause, the Contracts Clause, and the ·Equal Protection Clause of the United States Constitution. 226 F.3d 412. Pursuant to the challenged legislation, insurers that had withdrawn from the Louisiana insurance market or substantially reduced their underwriting in the state were subjected to the second injury fund's assessment formula, which was expressly made retroactive to policies written before the legislation's enactment. *Id.* at 415. The Fifth Circuit concluded that the legislation constituted an unlawful taking, relying on the analysis employed by the plurality in *Eastern Enterprises.*[39] In reviewing the Louisiana legislation to "evaluat[e] . . . the 'justice and fairness' of the government action," the Fifth Circuit framed its analysis by using three factors that the plurality in *Eastern Enterprises* used to perform its analysis: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with reasonable investment-backed expectations; and (3) the character of the government action. 226 F.3d at

416 (citing *Eastern Enterprises,* 524 U.S. at 523, 118 S.Ct. 2131).

In analyzing the economic impact of the challenged legislation, the Fifth Circuit explained that the legislation "impose[d] a considerable, novel financial burden on the plaintiffs." 226 F.3d at 416. Prior to the legislation's enactment, "insurers paid a net amount of zero for claims made on the Second Injury Fund and collected SIF premiums from their insureds only to pass-through the SIF assessments." *Id.* at 416–17. Under the provisions of the challenged act, insurers were assessed charges "based on benefits paid under insurance policies written before the law's effective date." 226 F.3d at 417. The Court in *McKeithen* noted that the plaintiff insurers who were no longer in the business of providing such insurance benefits, as contrasted to active insurers, had "no means to recoup the charge" and characterized the $50 million in retroactively assessed costs as "substantial." *Ibid.* Of further importance to the Fifth Circuit in evaluating the economic impact of the Louisiana legislation was the fact that the "newly-created liability reflect[ed] no proportionality to the plaintiffs' experience with the SIF." *Ibid.* In marked contrast to serving as a payment intermediary for twenty years, receiving no net benefits and incurring no net costs, the plaintiff insurers were now required under the challenged act to make "significant net contributions to the fund." *Ibid.*

Focusing on the retroactive reach of the costs assessed to the insurers—a reach of twenty years—the Fifth Circuit quickly determined that the cost-neutrality basis of the prior funding scheme had been dismantled. The Court in *McKeithen* then examined whether the plaintiff insurers could have foreseen either an alteration in the premium-

---

38. In rejecting the contention that Eastern's subsidiary's post–1974 signatory status to relevant wage agreements were sufficient to attach liability under the Coal Act, the United States Supreme Court stated that "the Act assigns Eastern responsibility for benefits relating to miners that Eastern itself, not EACC [its subsidiary], employed, while EACC would be assigned the responsibility for any miners that it had employed." 524 U.S. at 530, 118 S.Ct. 2131 (citing 26 U.S.C. § 9706(a)).

39. Essentially dismissing Justice Kennedy's fundamental objection to. the application of a Takings Clause analysis to economic legislation by stating that his concerns that a specific property interest must be identified "would be muted-or mooted-here," the Fifth Circuit reasoned that because "Justice Kennedy's due process analysis focuses on retroactivity . . . [it] is essentially harmonious with the reasoning of the other four justices." 226 F.3d at 420.

based assessments or the retroactive imposition of a benefits-based method of assessing premiums. 226 F.3d at 418. The Court opined:

> While plaintiffs might have been on notice that there could be a change away from premium-based assessments, there was no evidence that the plaintiffs should have suspected abandonment of cost-neutrality. There was no evidence that the cost of financing the SIF was ever intended to be borne by insurers, that there existed any rationale or policy for imposing the cost on insurers, or that the state was contemplating shifting the burden of funding onto insurers.

*Ibid.* (footnote omitted). On the issue of whether the plaintiff insurers had sufficient notice of the challenged legislation, the court observed in *McKeithen:* "There are no indications in the law itself, in the legislative history, or in the record of this case that the SIF was financially insecure, or that employers were having trouble bearing the costs of operating the SIF." 226 F.3d at 419.

Rejecting the district court's analysis that the questioned legislation was merely " 'a rational attempt by the state to impose the costs inherent in a certain type of business activity on those that have profited from the fruits of the business in question,' " the Fifth Circuit explained that the plaintiff insurers, as contrasted to the employers, did not benefit from the prior second injury funding scheme. *Ibid.* Describing the nature of the government action at issue as "unusual," in that the Legislature failed to "identify[ ] a compelling problem, such as the financial insecurity of the SIF," the Fifth Circuit determined that the challenged legislation had " 'single[d] out certain [parties] to bear a burden that is substantial in amount, based on the [parties'] conduct far in the past, and unrelated to any commitment that the [parties] made or to any injury they caused....' " *Ibid.* (quoting *Eastern Enterprises*, 524 U.S. at 537, 118 S.Ct. 2131).

In concluding that the Louisiana statute constituted a taking, the Fifth Circuit reasoned:

> Act 188 as applied to plaintiffs' pre-enactment contracts retroactively imposes a heavy economic burden on those who could not reasonably anticipate the liability. *The extent of the liability is disproportionate to the plaintiffs' experience with the SIF, and the legislation is unnecessary to substantially advance a legitimate state interest.*

226 F.3d at 420 (emphasis supplied).

### 3. Applicability of Takings Clause Analysis

With minimal application of the analysis employed in *Eastern Enterprises* and *McKeithen,* Appellants conclude that those decisions support their collective position that the assessment of premium rates which include an amount for amortizing the discount constitutes an unlawful taking. Preferring to focus on various broadly-worded statements that appear in those decisions, Appellants overlook the glaring distinctions between the facts presented in this case and those at issue in *Eastern Enterprises* and *McKeithen.* These factual distinctions are critical as the United States Supreme Court has recognized that the issue of whether compensation is compelled in the instance of " 'economic injuries caused by public action' ... is essentially ad hoc and fact intensive." *Eastern Enterprises,* 524 U.S. at 523, 118 S.Ct. 2131 (quoting *Kaiser Aetna v. U.S.,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)). Disregarding the critical distinctions between their authority and the case *sub judice,* Appellants reason, in rather summary fashion, that the three factor test[40] used by the plurality in *Eastern Enterprises* to analyze issues of regulatory takings necessarily results in the conclusion that the Division's actions are in violation of the Takings Clause. We disagree.

 As an initial matter, we observe that both *Eastern Enterprises* and *McKeithen* involved premium assessments with a severe

---

**40.** Those factors are: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with reasonable investment-backed expectations; and (3) the character of the government action. *Eastern Enterprises,* 524 U.S. at 523, 118 S.Ct. 2131.

retroactive reach. In the former case it was thirty-five to fifty years and in the latter it was twenty years. As we explained above in refuting Appellant's contention that the additional component of the premium tax is a retroactive cost, the portion of the premium reflecting the amortization of the discount is a current cost deemed necessary to keep the fund afloat, rather than an assessment solely correlated to second injury life awards. Moreover, the mere fact that the quantity of an employer's second injury life awards is a component in the complex formula devised to address the remedial issue of the funding deficit does not render the premium assessment formula unconstitutional. *See, e.g., Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (upholding imposition of retroactive cost-spreading scheme for black lung benefits legislation among employers who had profited from fruits of affected employees' labor against due process challenge); *see also McKeithen,* 226 F.3d at 419 (suggesting that financial insecurity of second injury fund or inability of employers to solely bear costs of fund would be relevant factors concerning issue of assessing retroactive premiums). Unlike the methodology employed to calculate premiums in *Eastern Enterprises,* where the assessment was directly and specifically tied to the employment of individuals several decades earlier, the premium assessment at issue here has no far reaching retroactive effect. Even assuming some retroactive effect of the premium assessment under consideration, retroactivity alone does not render a statute unconstitutional. *See Unity Real Estate,* 178 F.3d. at 671 (stating that "[w]here Congress acts reasonably to redress an injury caused or to enforce an expectation created by a party, it can do so retroactively"). And, because the premium assessment was calculated based in terms of reducing the Fund's deficit as a whole, rather than being directly

correlated to the second injury fund, Appellants fail in their attempt to convince us that the costs under scrutiny qualify as severely retroactive under the reasoning of the plurality opinion in *Eastern Enterprises* and *McKeithen.*

Another significant difference between *Eastern Enterprises* and *McKeithen* and this case, which we have already touched upon, arises from the concern that substantially all employers in this state, not just self-insured employers or subscribers to the second injury fund, are subject to the inclusion of the amortization of the discount factor in their premiums. What was critical to the plurality in *Eastern Enterprises* and the Fifth Circuit in *McKeithen* was the singling out of certain entities for cost assessments. *See* 524 U.S. at 537, 118 S.Ct. 2131; 226 F.3d at 419. Had only self-insured employers been charged a premium which contained an amortization of the discount factor, serious issues of fairness would undoubtedly be raised. In contrast to the scenarios presented in *Eastern Enterprises* and *McKeithen,* the Performance Council did not single out any one type of employer in its distribution of premium costs. Appellants have simply not demonstrated that the premiums assessments of which they complain are disproportionate to their experience with the Fund.[41] *See Eastern Enterprises,* 524 U.S. at 523, 118 S.Ct. 2131 (recognizing that "party challenging governmental action as an unconstitutional taking bears a substantial burden").

Of importance to the plurality in *Eastern Enterprises* and the Fifth Circuit in *McKeithen* were the related issues of investment-backed expectations and foreseeability. In *Eastern Enterprises,* the plurality focused on the fact that Eastern could not have contemplated the imposition of liability for lifetime health benefits for coal miners due to its

---

41. For fiscal year 1998, the total amount of amortization of the discount attributable to both regular subscribers and self-insured employers was $216 million; $46 million of that amount was allocated to self-insured employers. Self-insured employers were thus allotted 21% of the amortization factor for fiscal year 1998. That percentage of collective responsibility for self-insured employers was determined based on the use of a comparison of micro insurance reserve

analysis ("MIRA") case reserves between regular subscribers and self-insured employers for *all* of the Fund's liabilities. In arguing below that their percentage of responsibility should have only been 14%, Appellants' expert was purportedly basing his analysis on second injury claims only. Yet, the MIRA analysis employed was based on all liabilities of the Fund and not just second injury liabilities.

departure from the coal mining business almost ten years prior to the time when such an industry wide agreement was reached. Similarly, in *McKeithen* the Fifth Circuit emphasized that the insurers, who had always operated solely as payment conduits, had no basis for anticipating a change in the funding formula that would have involved the assessment of premiums against them. The appellate court emphasized that "there was no pattern of conduct on the state's part that could have given the plaintiffs sufficient notice that cost-neutrality would end." *McKeithen,* 226 F.3d at 419. In stark contrast to both of those cases, Appellants have been on notice beginning in 1993 when the workers' compensation statutes were rewritten and then in 1995 when the statutes were substantially rewritten, and arguably sooner,[42] that the Fund was facing the possibility of serious financial infirmity. *See Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 226–27, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (upholding retroactive legislation based on fact that employers were continuously aware during entire period of retroactivity that Congress was studying funding mechanism for multiemployer pension plans and that statutory withdrawal liability might be required). Consequently, Appellants cannot seriously posit that an increase in premiums that would force them to bear some of the financial burden of keeping the Fund afloat was not foreseeable.

As opposed to the findings by the plurality in *Eastern Enterprises* and the court in *McKeithen,* the nature of the government action at issue in this case is not "unusual." *See* 524 U.S. at 537, 118 S.Ct. 2131; 226 F.3d at 419. Unlike the concerns raised by the plurality in *Eastern Enterprises* that Congress had "single[d] out certain employers to

bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused," the government action at issue here is prototypical in that the Legislature, through the efforts of the Performance Council, took action in response to the compelling state interest of keeping the Fund afloat and the related interest of preventing a lowering of the state's bond ratings. 524 U.S. at 537, 118 S.Ct. 2131. There can be no question that the financial insecurity of the Fund—a compelling state interest—is the driving force behind implementing, as part of the premium costs, an amortization of the discount factor. In clear contrast to the lack of commitment by the employers in *Eastern Enterprises* and the insurers in *McKeithen,* Appellants made an implicit commitment to their employees to pay all fairly and reasonably assessed premiums as a means of enabling their employees to receive the benefits to which they are entitled under the workers' compensation statutes.[43] And, as discussed above, Appellants are unable to succeed on a disproportionality argument, as they, along with other non-excluded employers, were assessed premium increases that included the amortization of the discount factor.[44]

Further evidence of the fact that Appellants do not stand in shoes comparable to the plaintiffs in either *Eastern Enterprises* or *McKeithen* is shown by their collective inability to demonstrate that: (a) they could not have reasonably anticipated an increase in premium costs due to the well-known financial situation of the fund; (b) their assessment is disproportional to their experience with the Fund; and (c) that the legislative action taken in implementing the costs at

---

**42.** From our review of the annual reports pertaining to the workers' compensation fund, it is clear that beginning in 1985 the Fund was experiencing serious financial losses. With the first utilization of actuarial reports in 1989, it was apparent the Fund had a significant unfunded liability. An initial actuarial report compiled in June 1989 estimated the deficit at $316.1 million and a later report produced in December 1989 revised that figure to $355 million.

**43.** Like it or not, a collective responsibility among all non-excluded employers is inherent to

the workers' compensation scheme. Obviously, when participating employers depart from the system or self-insured employers fail to meet their bond requirements, the Fund, as a whole is affected. Because the workers' compensation scheme contemplates the availability of continuing funds to pay for the claims of entitled employees, Appellants, along with all other non-excluded employers, have a corporate responsibility for the Fund's solvency.

**44.** *See supra* note 41.

issue was "unnecessary to substantially advance a legitimate state interest." *McKeithen*, 226 F.3d at 420 (citing *Eastern Enterprises*, 524 U.S. at 528–29, 118 S.Ct. 2131). Upon careful and thorough review of the applicable authority, we find that the formula developed by the Performance Council which allocates an amount for the amortization of the discount in assessing the workers' compensation premium tax for self-insured employers does not constitute an undue taking without compensation in violation of either the federal or state constitution.

## F. Substantive Due Process Violation

 Appellants argue that the premium tax increase violates the due process clauses of the federal and state constitutions on the grounds that there is no rational basis underlying the legislative measures at issue. *See* U.S. Const. amend. XIV; W.Va. Const. art. III, § 10. In making this argument, Appellants overlook the fact that "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and ... the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery*, 428 U.S. at 15, 96 S.Ct. 2882; *see also Eastern Enterprises*, 524 U.S. at 528, 118 S.Ct. 2131 (recognizing that "Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties").

 Challenges to economic legislation based on substantive due process are examined under a deferential standard of review. *Concrete Pipe & Products v. Constr. Laborers Pension Trust*, 508 U.S. 602, 639, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (citing *Usery*, 428 U.S. at 19, 96 S.Ct. 2882). Understandably, the high level of deference that is accorded to legislative actions aimed at addressing economic problems results from a recognition that lawmakers are uniquely charged with responsibility for passing laws

designed to cure such serious social concerns. Consequently, courts are unwilling, as a rule, to second guess the wisdom of cost-spreading mechanisms adopted in connection with a particular legislative act, provided that such legislation can be viewed as a rational means of addressing the economic problem at issue. *See Usery*, 428 U.S. at 19, 96 S.Ct. 2882 ("It is enough to say that the Act approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension.").

The decision of the Performance Council, operating under recognized principles of legislative power delegation,[45] to spread the costs of amortizing the discount between all employers is a determination which is similarly entitled to deference. *See Usery*, 428 U.S. at 18, 96 S.Ct. 2882 (stating that "it is for Congress to choose between imposing the burden of inactive miners' disabilities on all operators, including new entrants and far-sighted early operators who might have taken steps to minimize black lung dangers, or to impose that liability solely on those early operators whose profits may have been increased at the expense of their employees' health"). In repeatedly remonstrating their lack of responsibility for the financial condition of the Fund, what Appellants overlook is the collective responsibility of self-insured employers as a class for unpaid benefits and their concomitant interest and role in preventing the insolvency of the Fund. Moreover, the critical issue is whether the methodology chosen for assessing the additional premiums costs at issue here is a rational means of addressing the Fund's plight, and not identifying who caused the problem.

 In upholding the payment of health benefits under the Coal Act against due process challenges raised by employers who had been signatories to coal agreements in 1978 but who had been out of the industry for eleven years, the Third Circuit declared that "[e]ssentially, the Act is Congress's attempt

---

**45.** We outright reject the contention raised by Pine Ridge that the Performance Council exceeded the powers conferred upon it by the Legislature, noting that the Legislature provided the

Council with sufficient guidance for the performance of its duties. *See* Syl. Pt. 3, *Quesenberry v. Estep*, 142 W.Va. 426, 95 S.E.2d 832 (1956).

to do equity." *Unity Real Estate*, 178 F.3d at 673. As with any piece of economic legislation that seeks in a comprehensive fashion to address a serious financial obligation, there will always be challenges predicated on fairness. Given the entitlement of deference accorded to such legislation, however, we can only set aside the premium funding mechanism at issue here if we conclude that the adopted funding structure was arbitrary and irrational. It is clear to this Court that the methodology employed to calculate the amortization of the discount factor involved a detailed effort to identify all relevant factors that contributed to the Fund's financial situation. That process, which was grounded in recognized insurance principles and correlated to the experience of the various differing types of employers with the Fund, appears reasonable. While we cannot make this declaration with the preciseness of a mathematical formula, our reviewing obligation does not require such exactness: "[U]nder the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means." *Concrete Pipe*, 508 U.S. at 639, 113 S.Ct. 2264.

Based on our opinion that the Performance Council was clearly charged with responsibility for setting premium rates that included costs necessary to maintain a solvent workers' compensation fund *and* to reduce the deficit, we cannot conclude that the mechanism by which the Performance Council opted to address the serious and well-known financial situation of the Fund was either arbitrary or irrational. *See* W.Va.Code § 23-2-4(a)(2). Like Congress's actions in enacting the Coal Act, the Performance Council was simply "attempt[ing] to do equity." *Unity Real Estate*, 178 F.3d at 673. And, as the United States Supreme Court observed in *Usery*, the issue of whether a cost-spreading mechanism other than the one legislatively chosen "would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Usery*, 428 U.S. at 19, 96 S.Ct. 2882. Consequently, we determine that the formula developed by the Performance Council which allocates an amount for the amortization of

the discount in assessing the workers' compensation premium tax for self-insured employers does not violate the Due Process clause of either the federal or state constitution.

Finding no merit in the arguments raised by Appellants, we affirm the January 17, 2002, final order of the Circuit Court of Kanawha County and deny all relief requested. Specifically, we decline to enter the requested order to compel the Commissioner to meet fiduciary obligations of the Act, past or present, deferring in the circumstances to the current efforts of the executive and legislative branches to address such workers' compensation issues in plenary fashion. In consideration of the compelling circumstances, we hereby direct the entry of the necessary order and the issuance forthwith of the mandate pertaining to this decision.

Affirmed.

Chief Justice STARCHER concurs and files a concurring opinion.

Justice DAVIS dissents and files a dissenting opinion joined by Justice MAYNARD.

Justice MAYNARD dissents and files dissenting opinion joined by Justice DAVIS.

MAYNARD, Justice, dissenting.

(Filed July 2, 2003)

There are many things wrong with the majority's affirmance of a clearly unlawful and unfair increase in premiums paid by self-insured employers. However, I will limit this dissent to my firm belief that the Workers' Compensation Division exceeded its statutory authority to allocate a portion of the "amortization of discount" to self-insured employers.

First, the numbers are absolutely appalling. According to Eastern Associated Coal, in round numbers, its premium jumped from 1.4 million dollars to 8.7 million dollars, an increase of 7.3 million dollars, in *one* year! When Chief Justice John Marshall said in 1819 that "the power to tax involves the power to destroy," he must have had a case just such as this in mind. To those who say,

well, this is not really a "tax," it is a "premium," my response is, call it whatever you like, the end result is the same. If the government has its boot on my neck, it does not matter if it is the left boot or the right boot.

What are we really destroying here? Make no mistake, what is crippled is not just the financial well-being of a few companies doing business in West Virginia, but also scarce West Virginia jobs. Worst of all is the immeasurable harm done to the business community's perception of West Virginia as a place to do business. If you were the CEO of a medium or large business and saw what was done to Eastern in this case, would you come to West Virginia and open a new business? Sadly, what is ultimately destroyed by decisions such as this is future economic development and the possibility of attracting new businesses and new jobs to West Virginia.

I want to emphasize just how much additional premiums some of these self-insured employers were forced to pay. For fiscal year 1998, Eastern Associated Coal's regular premium was approximately $1.4 million. To amortize the discount, Eastern was charged an additional $7,265,945.00, which is more than five times greater than Eastern's regular premium. According to Weirton Steel, a company which has struggled valiantly to keep good West Virginia jobs, it was charged $206,000.00 for fiscal year 1998. Weirton Steel has never subscribed to the Second Injury Reserve Fund and had paid nothing for second injury liabilities prior to July 1, 1998. The evidence shows that the Division charged self insurers a total of almost $46 million for amortization of the discount. There is an old joke about the government simplifying the tax return form to contain only two lines. Line 1 asks, "How much did you make last year?"—Line 2 says, "Send it in." I am afraid that is where we are heading with employers' workers' compensation premiums given the near bankruptcy of the fund and the lack of political will to stop the monthly hemorrhaging of millions of dollars out of the fund.

It is obvious to me that the Division imposed these significant premium increases without clear statutory authority. In W.Va. Code § 23–2–9(b) (1995), the Legislature spelled out the particular elements to be included in premium computations for self-insured employers. These are:

(1) A sum sufficient to pay the employer's proper portion of the expense of the administration of this chapter;

(2) A sum sufficient to pay the employer's proper portion of the expense of claims for those employers who are in default in the payment of premium taxes or other obligations;

(3) A sum sufficient to pay the employer's fair portion of the expenses of the disabled workers' relief fund; and

(4) A sum sufficient to maintain as an advance deposit an amount equal to the previous quarter's payment of each of the foregoing three sums.

The majority finds authority for the additional premiums levied against the appellants in subsection (1) in the phrase "the expense of the administration of this chapter." The majority reaches this conclusion despite its recognition that the phrase "expense of the administration of this chapter" is not defined by the workers' compensation act; "historic application of the phrase to self-insured employers' premium rates has only included the routine management costs of the Division[,]" and "the Legislature failed in 1995 to make parallel amendments between the general rate-making section and the self-insured employer premium tax section of the Act[.]" (Op. at 184.).

In a nutshell, the majority reasons as follows. First, the phrase "expense of the administration of this chapter" is ambiguous. Therefore, the Court must interpret the phrase by resorting to other statutory provisions. According to W.Va.Code § 23–1–1(a), "[t]he commissioner of the bureau of employment programs ... has the sole responsibility for the administration of this chapter except for such matters as are entrusted to the ... performance counsel." In addition, W.Va. Code § 23–2–5(g) provides that "no employee of an employer required by this chapter to subscribe to the workers' compensation fund shall be denied benefits provided by this chapter because the employer failed to sub-

scribe or because the employer's account is either delinquent or in default." When one adds these together, says the majority, one must conclude that there is statutory authority for the increased premiums levied on self-insured employers.

I fail to follow the majority's reasoning. At the outset, I do not agree that the phrase "the expense of the administration of this chapter" is ambiguous. In Syllabus Point 13 of *State v. Harden*, 62 W.Va. 313, 58 S.E. 715 (1907), *disapproved of on other grounds by Wiseman v. Calvert*, 134 W.Va. 303, 59 S.E.2d 445 (1950), this Court explained that "[a]mbiguity in a statute . . . consists of susceptibility of two or more meanings and uncertainty as to which was intended. Mere informality in phraseology or clumsiness of expression does not make it ambiguous, if the language imports one meaning or intention with reasonable certainty." In addition, "[i]n the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meaning." Syllabus Point 1, *Tug Valley Recovery Center, Inc. v. Mingo Cty. Comm.*, 164 W.Va. 94, 261 S.E.2d 165 (1979). The common ordinary meaning of the term "administration" is the management or direction of something. In fact, the dictionary definition of "administration" is "the management of any office, business, or organization; direction." *Random House Webster's Unabridged Dictionary* 26 (2nd ed. 1998). It is reasonably certain that "the expense of the administration of this chapter" in W.Va.Code § 23-2-9(b)(1) means the cost of the routine management of the Workers' Compensation Division. There is absolutely no specific indication in the statute that it means something different. Because "administration" is susceptible of only one meaning, it is not ambiguous. Accordingly, W.Va.Code § 23-2-9(b)(1) simply indicates that self-insured employers are responsible to pay their portion of the routine management costs of the Division.

In addition, "[i]t is an accepted rule of statutory construction that where a particular section of a statute relates specifically to a particular matter, that section prevails over another section referring to such matter only

incidentally." *Cropp v. State Workmen's Compensation Comm'r*, 160 W.Va. 621, 626, 236 S.E.2d 480, 484 (1977) (citation omitted). The two code sections relied on by the majority, W.Va.Code §§ 23-1-1(a) and 23-2-5(g), relate only incidentally, if at all, to self-insured employers. On the other hand, W.Va. Code § 23-2-9(b)(1) relates specifically to self-insured employers and should prevail.

However, even if it could be concluded that the term "administration" is ambiguous, I do not believe that our rules of statutory construction permit the interpretation of W.Va. Code § 23-2-9(b) arrived at by the majority. It is conceded by the majority that "the Legislature failed in 1995 to make parallel amendments between the general rate-making section and the self-insured employer premium tax section of the Act[.]" (Op. at 184.). This Court has recognized that,

[i]f the legislature includes a qualification in one statute, but omits the qualification in another related statute, courts should assume the omission was intentional; the courts infer that the Legislature intended the qualification would not apply to the latter statute. This canon is a product of logic and common sense, and it has special force when the statutory scheme is carefully drafted.

*State v. Sugg*, 193 W.Va. 388, 401 n. 14, 456 S.E.2d 469, 482 n. 14 (1995). The workers' compensation scheme is carefully drafted. Therefore, this Court should assume that the Legislature's failure to amend the self-insured employer premium tax section was intentional and should infer that the Legislature did not intend to require self-insured employers to participate in the deficit reduction process.

In sum, this Court should reverse the decision of the Workers' Compensation Division because it has exceeded its statutory authority. *See* W.Va.Code § 29A-5-4(g)(2) (authorizing court reversal of an agency decision in excess of statutory authority). By failing to do so, the majority abandons this Court's traditional rules of statutory construction, violates the canons of logic and common sense, and forces a wholly unsupported construction on an unambiguous statute in order to reach a desired result which is patently unfair.

Accordingly, I dissent. I am authorized to state that Justice DAVIS joins me in this dissent.

STARCHER, C.J., concurring:

(Filed July 9, 2003)

According to the two dissents, this Court should (1) ignore and overrule the opinions of the other two branches of government; and (2) help throw the workers' compensation fund into insolvency. I disagree.

The Legislature has had more than six years to make it clear that it did not want the 1997 burden-sharing assessments to apply to self-insured employers. But the Legislature has done nothing to indicate any dissatisfaction with having these assessments apply to all employers.

The appellant companies have experienced lobbyists who know how to have legislation introduced. If the Legislature has not acted in six years to exclude self-insured employers from paying a share of the assessments, it is safe to say that the Executive branch's reasonable interpretation and application of the 1995 statute does not offend the wishes of the Legislature.

The majority opinion is scholarly and well-reasoned with respect to the constitutional issues involved, and I need add nothing to that discussion. Reasonable minds can differ in this area, but it comes down to a fairness issue—an issue that in the instant case is consigned to the wisdom of the Legislative and Executive branches.

In this regard, it should be noted—one could never tell it from the dissenting opinions—that the dissents' bombastic and exaggerated charges and castigations—about "evil" policies that will "keep businesses out of West Virginia"—are directed entirely at policies that were *created, devised, set in place, and continued by the Legislative and Executive branches*—and not by this Court.

On some occasions, this Court decides that it must overrule an action by the Legislature or Executive—and then we catch heck for "judicial activism." On another day, we decide that we must uphold the Legislature and Executive—as in this case—and again we are attacked.

In this job, there is no pleasing everybody. I think we made the right call in this case. Accordingly, I concur.

DAVIS, Justice, dissenting:

(Filed July 9, 2003)

In this proceeding three employers, who are self-insured for workers' compensation purposes, appealed an order of the circuit court obligating them to share the burden of retiring a six billion dollar debt[1] that was caused by the State's failure to maintain a Second Injury Reserve Fund from 1947 to 1997. The majority opinion has disingenuously brushed aside the federal constitutional rights of the employers[2] and affirmed the circuit court's decision. For the reasons set out below, I dissent.

## I. BACKGROUND

In 1947, the State sought to encourage employers to hire workers that had preexisting injuries. The "carrot" used by the State to encourage employment of injured workers was the creation of the Second Injury Reserve Fund (hereinafter "Second Injury Fund"). *See* Acts 1947, Ch. 164, codified at W. Va.Code § 23-3-1. "The basic intent of the [Second Injury Fund] is to encourage the hiring of the handicapped by not charging an employer for preexisting disabilities[.]" *McClanahan v. Workmen's Comp. Comm'r*, 158 W.Va. 161, 163–64, 207 S.E.2d 184, 186 (1974). The legislature deemed this encouragement to be necessary because workers with preexisting injuries were more susceptible to sustaining other injuries that could collectively result in permanent total disability. *See* W. Va.Code § 23-3-1(d)(1) (1995) (Repl. Vol. 2002) ("If an employee who has a [second injury] becomes permanently and to-

---

1. The discounted value of the debt is $2.2 billion. However, for the purposes of my dissent, I will refer to the debt's actual value of six billion dollars.

2. The majority opinion also incorrectly resolved the state constitutional and non-constitutional assignments of error. However, my dissent will address only the federal constitutional issues raised in this appeal.

tally disabled through the combined effect of such previous injury and a second injury received in the course of and as a result of his or her employment, the employer shall be chargeable only for the compensation payable for such second injury[.]").

The Acts of 1947 set out a definite and express method for funding the Second Injury Fund. Pursuant to that method,

[a] portion of all premiums that shall be paid into the workers' compensation fund *by subscribers not electing to carry their own risk* ..., shall be set aside to create and maintain a surplus fund to cover ... the second injury hazard, and all losses not otherwise specifically provided for in this chapter.

W. Va.Code § 23–3–1(b) (emphasis added). The record in this case conclusively established that, from 1947 to 1997, the State failed to set aside monies from the Workers' Compensation Fund, as required by W. Va. Code § 23–3–1(b), and place such monies in the Second Injury Fund. As a result of such failure, the Second Injury Fund has an estimated six billion dollar deficit.

In 1997 the State, through its agents the Division of Workers' Compensation and the Performance Council, devised a plan to pay off the six billion dollar Second Injury Fund debt. Under that plan, called Resolution No. 11, self-insured employers were held responsible for helping to pay the Second Injury Fund debt. The State dragged self-insured employers into this deficit under the guise of paying increased "administrative" expenses.

The three self-insured employers in this appeal, Eastern Associated Coal, Pine Ridge Coal Company and Weirton Steel Corporation, challenged the State's authority to force them to help retire a debt that was created by the State's failure to comply with the law in funding the Second Injury Fund beginning in 1947.[3] The three employers argued

at the administrative level, in circuit court, and before this Court, that from 1947 to 1997 "administrative" expenses had never been defined to include payment of the Second Injury Fund deficit. *See Smith v. State Workmen's Comp. Comm'r,* 159 W.Va. 108, 116, 219 S.E.2d 361, 366 (1975) ("Except for the small charges for administrative expenses, self-insured employers make no payments into the Workmen's Compensation Fund, because ... such employers have elected to self-insure the payment of pecuniary compensation and medical attention." (citation omitted)).

The majority opinion has found that, although for fifty years "administrative" expenses for self-insureds did not include payment of the Second Injury Fund deficit, the federal constitution did not prohibit the State from redefining the term to force self-insureds into helping pay a six billion dollar debt that they had no role in creating.

## II. RESOLUTION NO. 11 VIOLATES THE CONTRACT CLAUSE

Weirton Steel argued in its reply brief that enforcement of Resolution No. 11 violated the Contract Clause of the federal constitution. The majority opinion, without explanation, totally failed to address this issue. This Court has no rule that precludes addressing the merits of an issue properly raised in a reply brief.[4] In fact, we have previously granted relief based solely upon issues raised in a reply brief. *See State ex rel. West Virginia Highlands Conservancy, Inc. v. West Virginia Div. of Envtl. Prot.,* 191 W.Va. 719, 720 n. 1, 447 S.E.2d 920, 921 n. 1 (1994) (granting relief even though "[t]he petitioners raise[d] th[e] particular request for relief in their reply brief"). *See also State ex rel. West Virginia Highlands Conservancy, Inc. v. West Virginia Div. of Envtl. Prot.,* 193 W.Va. 650, 653, 458 S.E.2d 88, 91 (1995)

---

3. The record shows that Pine Ridge and Weirton Steel, as self-insureds, did not subscribe to the Second Injury Fund. Although Eastern Associated was self-insured, it elected to subscribe to the Second Injury Fund.

4. Prior to 1980, our appellate rules did, in fact, prohibit raising an issue for the first time in a reply brief. *See State v. Starr,* 158 W.Va. 905, 914, 216 S.E.2d 242, 248 (1975) (noting that,

under Rule VI, Section 2 of the W. Va. Supreme Court Rules, " '[n]o alleged error or point, not set forth in the brief, shall be raised afterwards, either by reply brief, or in oral or printed argument' "). However, this prohibition was not incorporated into the current West Virginia Rules of Appellate Procedure, which were adopted in 1979 and made effective in 1980.

(noting that "the relief granted in *Highlands I* was raised in the relators' reply brief"). Consequently, I will address the Contract Clause issue, even though the majority opinion incorrectly failed to do so.

Under Article I, section 10, clause 1 of the United States Constitution, "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts[.]"[5] This Court has noted that "the [C]ontract [C]lause prohibits the passage of a statute or law which impairs the obligation of an existing contract." *Collins v. City of Bridgeport*, 206 W.Va. 467, 475, 525 S.E.2d 658, 666 (1999). "[T]he Contract Clause has been interpreted to apply to legislative impairments of 'public' contracts, or contracts to which the state or its agent is a party." *National Educ. Ass'n–Rhode Island by Scigulinsky v. Retirement Bd. of Rhode Island Employees' Ret. Sys.*, 890 F.Supp. 1143, 1151 (D.R.I.1995). It has been observed that "the United States Supreme Court has been adamant in holding that 'impairments of a State's own contracts w[ill] face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties.'" *State ex rel. West Virginia Reg'l Jail & Corr. Facility Auth. v. West Virginia Inv. Mgmt. Bd.*, 203 W.Va. 413, 424, 508 S.E.2d 130, 141 (1998) (Davis, C.J., dissenting) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 n. 15, 98 S.Ct. 2716, 2722 n. 15, 57 L.Ed.2d 727 (1978)). *See also Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1249 (3d Cir.1987) ("When the state is a contracting party, the legislative judgment is subject to stricter scrutiny than when the legislation affects only private contracts.").

A three-part test is used in analyzing an alleged Contract Clause violation. First, a court must determine whether the challenged law operates "as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978) (footnote omitted). Second, if the impairment is substantial, the court must determine whether there is "a significant and legitimate public purpose behind the [challenged law.]" *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983). Third, if a legitimate public purpose is demonstrated, the court must determine whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the challenged law's] adoption." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977).[6] Utilizing this test, I will demonstrate that the use of Resolution No. 11 to retroactively impose a six billion dollar Second Injury Fund deficit on the self-insured employers in this case violates the Contract Clause.

### A. Substantial Impairment of a Pre–Existing Contract

The first step in a Contract Clause analysis is establishing a substantial impairment of a pre-existing contract. Ascertaining the existence of a substantial impairment of a pre-existing contract also involves a three part test: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992). *See also Renaud v. Wyoming Dep't of Family Services*, 203 F.3d 723, 728 (10th Cir.2000).

5. It is settled law that the Contract Clause applies only to the states and not to the federal government. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 732 n. 9, 104 S.Ct. 2709, 2719 n. 9, 81 L.Ed.2d 601 (1984), *superceded by statute as stated in I.A.M. Nat. Pension Fund v. Allied Corp.*, 596 F.Supp. 481 (D.D.C.1984).

6. *See* Syl. pt. 4, *Shell v. Metropolitan Life Ins. Co.*, 181 W.Va. 16, 380 S.E.2d 183 (1989) ("In determining whether a Contract Clause violation has occurred, a three-step test is utilized. The initial inquiry is whether the statute has substantially impaired the contractual rights of the parties. If a substantial impairment is shown, the second step of the test is to determine whether there is a significant and legitimate public purpose behind the legislation. Finally, if a legitimate public purpose is demonstrated, the court must determine whether the adjustment is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.").

I will address each of these factors separately.

1. **Contractual Relationship.** It has correctly been held that "[a] statutory enactment is generally presumed not to create 'contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *Koster v. City of Davenport,* 183 F.3d 762, 766 (8th Cir. 1999) (quoting *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432 (1985)).[7] However, "[i]f the language of the statute expressly indicates that the statute is being enacted to form a contract, a determination that the state is party to a binding obligation is clear." *National Educ. Ass'n–Rhode Island by Scigulinsky v. Retirement Bd. of Rhode Island Employees' Ret. Sys.,* 890 F.Supp. at 1152. The mere fact that a statute does not use language expressly creating a contract does not mean that a contract cannot be found in a statute. The United States Supreme Court has noted that, "[i]n general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." *United States Trust Co.,* 431 U.S. at 17 n. 14, 97 S.Ct. at 1515 n. 14. *See also Dadisman v. Moore,* 181 W.Va. 779, 789, 384 S.E.2d 816, 826 (1988) ("A statute is treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature." (citation omitted)). When "language and circumstances" are used to find a contract from a statute, the contract is deemed implied. *See Nieves,* 819 F.2d at 1244 ("[T]he Contract Clause reaches ... implied contracts....").

In the instant case, the applicable laws do not contain language that expressly creates a contract between the State and the self-insured employers in this case, that is, "[m]ost of the words typically associated with contract formation, such as 'contract,' 'consideration,' 'acceptance,' and 'reliance,' do not appear in the statute[s]." *Perry v. Rhode Island,* 975 F.Supp. 418, 424 (D.R.I. 1997). However, as I will show, an implied contract is clearly established when viewing the language and the circumstances attendant to those laws.[8] *See In re Workers'*

---

7. Finding a public contractual obligation has considerable effect. It means that a subsequent legislature is not free to significantly impair that obligation for merely rational reasons. Because of this constraint on subsequent legislatures, and thus on subsequent decisions by those who represent the public, there is, for the purposes of the Contract Clause, a higher burden to establish that a contractual obligation has been created. For similar reasons, this issue is one of federal, not state law.
*Parella v. Retirement Bd. of Rhode Island Employees' Ret. Sys.,* 173 F.3d 46, 60 (1st Cir.1999).

8. A case which helps to illustrate how an implied contract may be found in a statute is *Mississippi ex rel. Robertson v. Miller,* 276 U.S. 174, 48 S.Ct. 266, 72 L.Ed. 517 (1928). In *Robertson* the plaintiff was a former revenue agent for the state of Mississippi. During the period that the plaintiff was a revenue agent the State had a statute which permitted him to receive a commission for all suits initiated by him to recover taxes. Shortly after the plaintiff left his position, the State amended the statute to allow his successor to obtain a share of all commissions earned from suits filed by the plaintiff before he left office. Subsequent to the passage of the amended statute the plaintiff's successor obtained commissions from suits initiated by the plaintiff. The plaintiff thereafter filed a lawsuit to prevent his successor from sharing in the commissions. The state trial court applied the amended statute and awarded the plaintiff half of the commissions. The State Supreme Court affirmed.

In the appeal to the United States Supreme Court the plaintiff in *Robertson* argued that the amended statute was not enforceable because it violated the Contract Clause. In a unanimous opinion the Supreme Court agreed with the plaintiff. The opinion in *Robertson* found that the statute in-place when the plaintiff was in office created an implied contract that entitled him to recover a full commission. This issue was succinctly addressed in the opinion as follows:

It is well understood that the contract clause does not limit the power of a state during the terms of its officers to pass and give effect to laws prescribing for the future the duties to be performed by, or the salaries or other compensation to be paid to, them. But, after services have been rendered by a public officer under a law specifying his compensation, there arises an implied contract under which he is entitled to have the amount so fixed. And the constitutional protection extends to such contracts just as it does to those specifically expressed. The selection of plaintiff to be the Revenue Agent amounted to a request or direction by the State that he exert the authority and discharge all the duties of that office. In the performance of

*Compensation Refund,* 46 F.3d 813 (8th Cir. 1995) (finding contract between state workers' compensation agency and insurers based upon statute and other documents).[9]

The next step in the analysis requires the application of traditional contract principles to determine the implied contract between the State and the self-insured employers in this case. Part of the applicable contract framework was set out in *National Education Association–Rhode Island by Scigulinsky v. Retirement Board of Rhode Island Employees' Retirement System,* 890 F.Supp. at 1157, as follows:

> In order for an agreement to be enforceable under contract law, the parties must manifest their objective intent to be bound. Such intent is manifested through one party's offer and the other party's acceptance of the offer. When the offeror seeks acceptance through an act of performance on the part of the offeree, the offeror proposes a unilateral contract. A unilateral contract consists of a promise made by one party in exchange for the performance of another party, and the promisor becomes bound in contract when the promisee performs the bargained for act.

(Citations omitted). *See also Cook v. Heck's Inc.,* 176 W.Va. 368, 373, 342 S.E.2d 453, 458 (1986) ("The concept of unilateral contract, where one party makes a promissory offer and the other accepts by performing an act rather than by making a return promise, has also been recognized: 'That an acceptance may be effected by silence accompanied by an act of the offeree which constitutes a performance of that requested by the offeror is well established.' ") (quoting *First Nat'l Bank v. Marietta Mfg. Co.,* 151 W.Va. 636, 641–42, 153 S.E.2d 172, 176 (1967)). Moreover, in the instant case, the contract between the parties comes under the legal theory of an "implied in fact" contract, not an "implied in law" contract. "An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.' "[10] *Hercules, Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 986, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. .709, 43 S.Ct. 425, 426–427, 67 L.Ed. 816 (1923)). *See also Johnson v. National Exch. Bank of Wheeling,* 124 W.Va.

---

services so required of him plaintiff made the investigations and brought the suits to discover and collect the delinquent taxes. Under the statutes then in force as construed by the highest court of the State, he thereupon became entitled to the specified percentages of the amounts subsequently collected on account of the taxes sued for. The retroactive application of c. 170 would take from him a part of the amount that he had theretofore earned. That would impair the obligation of the implied contract under which he became entitled to the commissions.

276 U.S. at 178–179, 48 S.Ct. at 268 (citation omitted). *See also Fisk v. Jefferson Police Jury,* 116 U.S. 131, 134, 6 S.Ct. 329, 330, 29 L.Ed. 587 (1885) ("[A]fter the services have been rendered, under a law, resolution, or ordinance which fixes the rate of compensation, there arises an implied contract to pay for those services at that rate.").

9. The case of *General Motors Corp. v. Romein,* 503 U.S. 181, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) is factually distinguishable from the instant case. In *General Motors* the Supreme Court was asked to determine whether a workers' compensation statute was impliedly incorporated into contracts between employees and employers. The Court found that the statute was not impliedly part of the contract between em-

ployees and employers. *But see Nieves,* 819 F.2d at 1244–46 (finding workers compensation statute was incorporated in contract between employees and employer). In the instant case, however, the issue is not whether our workers' compensation laws are part of a contract between employees and employers. The instant case presents the question of whether our workers' compensation laws formed an implied contract between the State and self-insured employers.

10. "[A] contract implied in law, sometimes referred to as a 'quasi-contract,' may exist based on principles of equity and to prevent unjust enrichment." *Contship Containerlines, Inc. v. Howard Indus., Inc.,* 309 F.3d 910, 913 (6th Cir.2002). *See also Johnson v. National Exch. Bank,* 124 W.Va. 157, 161, 19 S.E.2d 441, 443 (1942) (recognizing the importance of distinguishing between quasi-contracts and contracts implied in fact, and observing that quasi contractual obligations " 'are imposed by law for purpose of bringing about justice without reference to intention of the parties, the only apparent restrictions upon the power of the law to create such obligations is they must be of such a sort as would have been appropriately enforced under common-law procedure by a contractual action.' " (citations omitted)).

157, 19 S.E.2d 441 (1942) (noting that a contract implied in fact "presupposes an obligation 'arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words.' It requires a meeting of the minds, just as much as an express contract." (citation omitted)). "In short, an implied-in-fact contract arises when an express offer and acceptance are missing but the parties' conduct indicates mutual assent." *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed.Cir.1998). Like an express contract, an implied-in-fact contract requires "an offer and an acceptance supported by consideration." *Art's Flower Shop, Inc. v. Chesapeake & Potomac Tel. Co. of West Virginia, Inc.*, 186 W.Va. 613, 616–617, 413 S.E.2d 670, 673–674 (1991). *See also City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir. 1990) (indicating an implied contract requires showing "(1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance."). I will now outline separately the offer, acceptance and consideration that formed the implied contract in this case.

(a) **Offer.** The contractual offer[11] made by the State in this case is found in several statutes.[12] First, W. Va.Code § 23–2–1(a) (1995) (Repl. Vol. 2002) obligates all employers to subscribe to and pay premium taxes into the general Workers' Compensation Fund.[13] The general Workers' Compensation Fund was created under W. Va.Code § 23–3–1(a) (1995) (Repl. Vol. 2002).[14] The methodology for paying premium taxes into the general Workers' Compensation Fund, for an employer who must subscribe to the fund, is a percentage of the employer's gross wages payroll, as set out under W. Va.Code § 23–2–5(a) (1999) (Repl. Vol. 2002).[15] Second, in

11. "The Restatement defines an offer as a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *National Educ. Ass'n*, 890 F.Supp. at 1157 (quoting Restatement (Second) of Contracts, § 24).

12. The relevant statutes cited by me have been amended on numerous occasions during their existence. However, there is no dispute in this case that the relevant parts of the laws herein referenced were applicable to the three employers in this case.

13. W. Va.Code § 23–2–1(a) (1995) (Repl. Vol. 2002) reads in full:

The state of West Virginia and all governmental agencies or departments created by it, including county boards of education, political subdivisions of the state, any volunteer fire department or company and other emergency service organizations as defined by article five [§§ 15–5–1 et seq.], chapter fifteen of this code, and all persons, firms, associations and corporations regularly employing another person or persons for the purpose of carrying on any form of industry, service or business in this state, are employers within the meaning of this chapter and are hereby required to subscribe to and pay premium taxes into the workers' compensation fund for the protection of their employees and shall be subject to all requirements of this chapter and all rules and regulations prescribed by the workers' compensation division with reference to rate, classification and premium payment: Provided, That such rates will be adjusted by the division to reflect the demand on the compensation fund by the covered employer.

14. W. Va.Code § 23–3–1(a) (1995) (Repl.Vol. 2002) reads in full:

The commissioner shall establish a workers' compensation fund from the premiums and other funds paid thereto by employers, as herein provided, for the benefit of employees of employers who have paid the premiums applicable to such employers and have otherwise complied fully with the provisions of section five [§ 23–2–5], article two of this chapter, and for the benefit, to the extent elsewhere in this chapter set out, of employees of employers who have elected, under section nine [§ 23–2–9], article two of this chapter, to make payments into the surplus fund hereinafter provided for, and for the benefit of the dependents of all such employees, and for the payment of the administration expenses of this chapter.

15. W. Va.Code § 23–2–5(a) (1999) (Repl.Vol. 2002) reads in full:

For the purpose of creating a workers' compensation fund, each employer who is required to subscribe to the fund or who elects to subscribe to the fund shall pay premium taxes calculated as a percentage of the employer's gross wages payroll at the rate determined by the workers' compensation division and then in effect. At the time each employer subscribes to the fund, the application required by the division shall be filed and a premium deposit equal to the first quarter's estimated premium tax payment shall be remitted. The minimum quarterly premium to be paid by any employer shall be twenty-five dollars.

(1) Thereafter, premium taxes shall be paid quarterly on or before the last day of the month following the end of the quarter, and

addition to creating a general Workers' Compensation Fund for subscribing employers, the State created a Second Injury Fund for workers sustaining multiple injuries with different employers. Under W. Va.Code § 23-3-1(b) the funding method chosen for the Second Injury Fund required "[a] portion of all premiums that [must] be paid into the workers' compensation fund *by subscribers not electing to carry their own risk* under section nine, article two of this chapter,

[must] be set aside to create and maintain a surplus fund to cover ... the second injury hazard[.]" [16] (Emphasis added.). Third, through W. Va.Code § 23-2-9(a) (1995) (Repl. Vol. 2002), the State created a detailed procedure whereby employers could elect not to subscribe to the Workers' Compensation Fund and the Second Injury Fund, provided the employers met certain stringent financial conditions. [17] This statute allowed qualified

shall be the prescribed percentage of the entire gross wages of all employees, from which net payroll is calculated and paid, during the preceding quarter. The division may permit employers who qualify under the provisions of rules promulgated by the compensation programs performance council to report gross wages and pay premium taxes at other intervals.

(2) Every subscribing employer shall make a gross wages payroll report to the division for the preceding reporting period. The report shall be on the form or forms prescribed by the division, and shall contain all information required by the division.

(3) After subscribing to the fund, each employer shall remit with each premium tax payment an amount calculated to be sufficient to maintain a premium deposit equal to the premium payment for the previous reporting period. The division may reduce the amount of the premium deposit required from seasonal employers for those quarters during which employment is significantly reduced. If the employer pays premium tax on a basis other than quarterly, the division may require the deposit to be based upon some other time period. The premium deposit shall be credited to the employer's account on the books of the division and used to pay premium taxes and any other sums due the fund when an employer becomes delinquent or in default as provided in this article.

(4) All premium taxes and premium deposits required by this article to be paid shall be paid by the employers to the division, which shall maintain a record of all sums so received. Any such sum mailed to the division shall be deemed to be received on the date the envelope transmitting it is postmarked by the United States postal service. All sums received by the division shall be deposited in the state treasury to the credit of the workers' compensation division in the manner now prescribed by law.

(5) The division may encourage employer efforts to create and maintain safe workplaces, to encourage loss prevention programs, and to encourage employer provided wellness programs, through the normal operation of the experience rating formula, seminars and other public presentations, the development of model safety programs and other initiatives as may be determined by the commissioner and the compensation programs performance council.

**16.** W. Va.Code § 23-3-1(b) reads in full:

A portion of all premiums that shall be paid into the workers' compensation fund by subscribers not electing to carry their own risk under section nine, article two of this chapter, shall be set aside to create and maintain a surplus fund to cover the catastrophe hazard, the second injury hazard, and all losses not otherwise specifically provided for in this chapter. The percentage to be set aside shall be determined pursuant to the rules adopted to implement section four [§ 23-2-4], article two of this chapter and shall be in an amount sufficient to maintain a solvent surplus fund. All interest earned on investments by the workers' compensation fund, which is attributable to the surplus fund, shall be credited to the surplus fund.

**17.** W. Va.Code § 23-2-9(a) (1995) (Repl.Vol. 2002) reads in full:

Notwithstanding any provisions of this chapter to the contrary, the following types of employers may apply for permission to self-insure their workers' compensation risk including their risk of catastrophic injuries. Except as provided for in subsection (e) of this section, no employer may self-insure its second injury risk.

(1) The types of employers are:

(A) Any employer who is of sufficient capability and financial responsibility to ensure the payment to injured employees and the dependents of fatally injured employees of benefits provided for in this chapter at least equal in value to the compensation provided for in this chapter; or

(B) Any employer of such capability and financial responsibility who maintains its own benefit fund or system of compensation to which its employees are not required or permitted to contribute and whose benefits are at least equal in value to those provided for in this chapter.

(2) In order to be approved for self-insurance status, the employer must:

(A) Have an effective health and safety program at its workplaces; and

(B) Provide security or bond in an amount to be determined by the compensation programs performance council which shall bal-

employers to voluntarily self-insure all of their workers' compensation obligations, including second injury claims. The State also provided, under W. Va.Code § 23-2-9(b), the manner in which totally self-insured employers would pay premium taxes into the general Workers' Compensation Fund.[18] Fourth, the State provided a mechanism for self-insured employers to take part in the Second Injury Fund. Under W. Va.Code § 23-2-9(e)(3)(A) self-insured employers subscribing to the Second Injury Fund must pay a specific premium tax.[19] Fifth, under W. Va.Code § 23-2-9(e)(3)(B) self-insured employers who subscribe to the Second Injury Fund, are only liable to an employee for a second injury, and all other compensation for permanent and total disability is paid from the Second Injury Fund.[20]

ance the employer's financial condition based upon an analysis of its audited financial statements and the full accrued value based upon generally accepted accounting principles of the employer's existing and expected liability; and

(C) Security or bond which may be in such form as the commissioner and the compensation programs performance council created pursuant to section one [§ 21A-3-1], article three, chapter twenty-one-a of this code permits.

(3) Any employer whose record upon the books of the division shows a liability, as determined on an accrued basis against the workers' compensation fund incurred on account of injury to or death of any of the employer's employees, in excess of premiums paid by such employer, shall not be granted the right, individually and directly or from such benefit funds or system of compensation, to be self-insured until the employer has paid into the workers' compensation fund the amount of such excess of liability over premiums paid, including the employer's proper proportion of the liability incurred on account of catastrophes or second injuries as defined in section one [§ 23-3-1], article three of this chapter and charged against such fund.

(4) Upon a finding that the employer has met all of the requirements of this section, the employer may be permitted self-insurance status. An annual review of each self-insurer's continuing ability to meet its obligations and the requirements of this section shall be made by the workers' compensation division. This review shall include a redetermination of the amount of security or bond which shall be provided by the employer. Failure to provide any new amount or form of security or bond may, in the division's discretion, cause the employer's self-insurance status to be terminated. The security or bond provided by employers prior to the second day of February, one thousand nine hundred ninety-five, shall continue in full force and effect until the performance of the employer's annual review and the entry of any appropriate decision on the amount or form of the employer's security or bond.

(5) Whenever a self-insured employer shall furnish security or bond, including replacement and amended bonds and other securities, as security to ensure the employer's or guarantor's payment of all obligations under this chapter for which the security or bond was furnished, such security or bond shall be in the most current form or forms approved and authorized by the division for use by the employer or its guarantors, surety companies, banks, financial institutions or others in its behalf for such purpose.

18. W. Va.Code § 23-2-9(b) reads in full:

Each self-insured employer shall, on or before the last day of the first month of each quarter, file with the division a certified statement of the total gross wages and earnings of all of the employer's employees subject to this chapter for the preceding quarter. Each self-insured employer shall pay into the workers' compensation fund as portions of its self-insured premium tax:

(1) A sum sufficient to pay the employer's proper portion of the expense of the administration of this chapter;

(2) A sum sufficient to pay the employer's proper portion of the expense of claims for those employers who are in default in the payment of premium taxes or other obligations;

(3) A sum sufficient to pay the employer's fair portion of the expenses of the disabled workers' relief fund; and

(4) A sum sufficient to maintain as an advance deposit an amount equal to the previous quarter's payment of each of the foregoing three sums.

19. W. Va.Code § 23-2-9(e)(3)(A) reads in full:

For those employers which do not self-insure their second injury risk, the premium tax for second injury coverage shall be determined by the rules which implement section four of this article. Such rules may provide for merit rate adjustments of the amount of premium tax to be paid based upon the accrued costs to be determined under generally accepted accounting principles of second injury benefits paid and to be paid to the employer's employees. Until such rules are adopted, the employer's premium taxes shall be determined in accordance with the provisions of chapter one hundred seventy-four, acts of the Legislature, one thousand nine hundred ninety-one.

20. W. Va.Code § 23-2-9(e)(3)(B) reads in full:

In case there is a second injury to an employee of any employer making such second

The statutory provisions cited above clearly show that the State made an "offer" to the self-insured employers in this case that permitted the employers to voluntarily opt out of mandatory participation in the State' s general Workers' Compensation Fund and its Second Injury Fund, upon meeting certain criteria. The offer also included an option to subscribe to the Second Injury Fund. *See National Educ. Ass'n*, 890 F.Supp. at 1157 ("By enacting a statute in 1987 which allowed plaintiffs to voluntarily join and thereafter contribute to the Retirement System, the General Assembly extended ... a statutory offer.").

**(b) Acceptance.** The record in this case is not in dispute in showing that each of the employers in this case accepted the statutory offer to self-insure. "The offer was accepted on the terms that [the State] proposed. Thus, a meeting of the minds was accomplished." *National Educ. Ass'n*, 890 F.Supp. at 1158.

Pine Ridge and Weirton Steel accepted the offer to self-insure so as not to have to subscribe to the general Workers' Compensation Fund, as well the Second Injury Fund. Eastern Associated accepted the offer to self-insure and not have to subscribe to the general Workers' Compensation Fund, as well as accepted the offer to subscribe to the Second Injury Fund.

**(c) Consideration.** For the purposes of contract law, " 'consideration consists either in some right, interest or benefit accruing to one party or some forbearance, detriment or responsibility given, suffered or undertaken by the other.' " *National Educ. Ass'n*, 890 F.Supp. at 1159 (quoting *Hayes v. Plantations Steel Co.*, 438 A.2d 1091, 1094 (R.I.1982) (internal citations omitted)). In the instant case, one form of consideration that was giv-

en, was that all three employers voluntarily undertook the responsibility of directly paying general workers' compensation benefits to their workers.[21] This burden relieved the State of all responsibilities involved with providing healthcare and other benefits to the self-insured employers' employees. Additionally, Pine Ridge and Weirton Steel also elected to provide direct benefits for their second injury employees. This additional undertaking by Pine Ridge and Weirton Steel provided direct financial savings to the State, because the State had the exclusive financial responsibility for providing permanent and total disability benefits to injured employees who came under the Second Injury Fund.

In sum, "[i]t is because [the employers] voluntarily opted [out of] the System ... and made decisions about their [businesses] in response [thereto] that the [employers] and the [State] are parties to an implied contract." *National Educ. Ass'n*, 890 F.Supp. at 1161.

**2. Impairment.** The second step in determining whether there has been a substantial impairment of a contractual relationship, requires "identifying the precise contractual right that has been impaired[.]" *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504, 107 S.Ct. 1232, 1251, 94 L.Ed.2d 472 (1987). "In other words, before [a] [c]ourt can determine whether the impairment is substantial, it must first identify what contractual rights, if any, have been impaired." *Equipment Mfrs. Inst. v. Janklow*, 300 F.3d 842, 851 (8th Cir.2002).

**(a) Pine Ridge and Weirton Steel.** Under the contract the State had with Pine Ridge and Weirton Steel, those two employers were self-insured and exempt from hav-

injury premium tax payments, the employer shall be liable to pay compensation or expenses arising from or necessitated by the second injury and such compensation and expenses shall be charged against the employer. After the completion of these payments, the employee shall be paid the remainder of the compensation and expenses that would be due for permanent total disability from the second injury reserve of the surplus fund. Such additional compensation and expenses shall not be charged against such employer.

**21.** *See* Syl. pt. 10, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975) ("Under W. Va.Code 1931, 23—2—9, as amended, the State Workmen's Compensation Commissioner is authorized to require that self-insured employers insure payment for all necessary medical treatment rendered to their injured employees incident to a compensable claim to the same extent provided all other covered employees by the Workmen's Compensation Act.").

ing to subscribe to the State's general Workers' Compensation Fund and its Second Injury Fund. As a result of this exemption, the State was obligated to only assess a special self-insured premium tax against them. Under W. Va.Code § 23–2–9(b), that premium tax consisted of payments for: (1) administrative expenses; (2) costs associated with employers who were in default; (3) expenses of the disabled workers' relief fund; and (4) an advance deposit for the foregoing three costs. Through the retroactive application of Resolution No. 11, the State has sought to hold Pine Ridge and Weirton Steel liable for helping to pay the Second Injury Fund deficit, by expanding the definition of administrative costs to include annual payments that are specifically earmarked to reduce the six billion dollar Second Injury Fund deficit.

The State's retroactive application of Resolution No. 11 impairs the premium tax provision of the contract the State had with Pine Ridge and Weirton Steel. Resolution No. 11 has caused the premium tax for Pine Ridge and Weirton Steel to include payment of a Second Injury Fund debt that accrued during the period 1947 to 1997. During that entire period Pine Ridge and Weirton Steel were self-insured and exempt from any responsibility for or to the States's Second Injury Fund.

Resolution No. 11, in effect, is making Pine Ridge and Weirton Steel, retroactively subscribe to the general Workers' Compensation Fund and Second Injury Fund, for a period of time when they were self-insured and contractually exempt from such subscription. Put another way, under Resolution No. 11 Pine Ridge and Weirton Steel are being forced to retroactively pay premiums for the benefit of second injury employees of nonself-insured employers, while simultaneously and exclusively paying all benefits for their own employees. Resolution No. 11 does not relieve Pine Ridge and Weirton Steel from their obligations to their own employees, as self-insurers, it imposes an additional obligation on Pine Ridge and Weirton Steel to constructively be the employers for employ-

ees of nonself-insured employers. Prior to the implementation of Resolution No. 11, under the terms of the contract Pine Ridge and Weirton Steel had with the State, they were absolutely exempt from the burden now being imposed by Resolution No. 11.

**(b) Eastern Associated.** Under the contract the State had with Eastern Associated, it was self-insured and exempt from having to pay into the State's general Workers' Compensation Fund. As a self-insured employer, Eastern Associated was assessed a special self-insured premium tax under W. Va.Code § 23–2–9(b). That premium tax consisted of payments for: (1) administrative expenses; (2) costs associated with employers who were in default; (3) expenses of the disabled workers' relief fund; and (4) an advance deposit for the foregoing three costs.

Eastern Associated's contract also included a subscription to the State's Second Injury Fund. As a result of its subscription to the Second Injury Fund, Eastern Associated was obligated to pay a specific premium tax for such coverage pursuant to W. Va.Code § 23–2–9(e)(3)(A).[22] Additionally, Eastern Associated's direct liability to a previously injured employee, who sustained a second injury that resulted in permanent total disability, was contractually limited to compensation for the second injury only, pursuant to W. Va.Code § 23–2–9(e)(3)(B).[23] Under that statute the State was exclusively responsible for all additional compensation. Further, the statute expressly stated that " [s]uch additional compensation and expenses shall not be charged against such employer." W. Va.Code § 23–2–9(e)(3)(B). See also Syl., Mullens v. State Workmen's Comp. Comm'r, 159 W.Va. 502, 223 S.E.2d 604 (1976) ("Where an employee of a self-insured employer who pays into the surplus fund sustains a second injury resulting in total permanent disability, the employer is liable for medical expenses occasioned by the second injury up to $3,000 under the second injury statute, and, thereafter, the surplus fund is chargeable for such medical payments." (citation omitted)).

---

**22.** See supra note 19 for the text of W. Va.Code § 23–2–9(e)(3)(A).

**23.** See supra note 20 for the text of W. Va.Code § 23–2–9(e)(3)(B).

Through Resolution No. 11, the State has sought to hold Eastern Associated liable for helping to pay the Second Injury Fund deficit, by expanding the definition of administrative costs under W. Va.Code § 23–2–9(b), to include annual payments that are specifically earmarked to reduce the Second Injury Fund deficit. The State's retroactive application of Resolution No. 11 impairs both the general self-insured premium tax provision and the self-insured second injury premium tax provision of the contract the State had with Eastern Associated.

Resolution No. 11 seeks to hold Eastern Associated responsible for helping to retire a deficit in the Second Injury Fund that accrued during the period 1947 to 1997. During that entire period Eastern Associated's self-insured administrative costs did not include additional monies earmarked for retiring the Second Injury Fund debt. One reason for this is, as a self-insured that subscribed to the Second Injury Fund, Eastern Associated was being assessed a specific premium tax to cover its participation in the Second Injury Fund. Nonself-insured employers were never assessed a specific premium tax in order to receive coverage under the Second Injury Fund. Resolution No. 11, in effect, is making Eastern Associated retroactively pay premiums for the benefit of second injury employees of nonself-insured employers, while simultaneously paying all benefits for its own employees, including a specific premium tax for its participation in the Second Injury Fund as a self-insurer.

**3. Impairment is Substantial.** Having shown that a contract existed between the State and Eastern Associated, Pine Ridge and Weirton Steel, and that Resolution No. 11 impaired that contract, I will now demonstrate that the impairment was substantial.

To determine whether an impairment is substantial, courts "consider the extent to which the [plaintiff's] reasonable expectations have been disrupted." *In re Workers' Comp.*

*Refund,* 46 F.3d 813, 819 (8th Cir.1995) (citation omitted). This does not mean that "[t]otal destruction of contractual expectations is ... necessary for a finding of substantial impairment." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (citation omitted). The jurisprudence of the United States Supreme Court requires a consideration of "whether the industry the complaining party has entered has been regulated in the past." *Id.* at 411, 103 S.Ct. at 704 (citations omitted).[24] It has been further explained that, "[h]eavy regulation of an industry may reduce reasonable expectations.... However, regulation does not automatically foreclose the possibility of contract impairment. Courts have found substantial impairment of contracts in heavily regulated areas of commerce." *In re Workers' Comp. Refund,* 46 F.3d at 820 (citing *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 250, 98 S.Ct. 2716, 2725, 57 L.Ed.2d 727 (1978) (employee pensions); *Holiday Inns Franchising, Inc. v. Branstad,* 29 F.3d 383, 385 (8th Cir.1994) (franchise agreements); *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare,* 742 F.2d 442, 451 (8th Cir.1984) (nursing home rates)). Indeed,

> [t]he substantiality of an impairment is not discounted simply because the affected contract provision is in some way connected to a previously regulated area. Rather, prior regulation of a field mitigates the substantiality of an impairment only to the extent that it opens a contracting party's eyes to the prospect of changes in the existing regulations or to new regulations that may affect the ... contract.

*Toledo Area AFL–CIO Council v. Pizza,* 154 F.3d 307, 324 (6th Cir.1998).

There is no question that the State's workers' compensation system is heavily regulated. The workers' compensation system was created by the State legislature and is

---

24. The heavily regulated industry doctrine reasons that a private actor who conducts business in an area subject to a pervasive legal scheme cannot expect to avoid the effects of a change in that scheme. The doctrine rests on the notion that in order for a reliance claim to receive Contract Clause protection, that reliance must at least be "reasonable."
Robert A. Graham, Note, *The Constitution, the Legislature, and Unfair Surprise: Toward a Reliance–Based Approach to the Contract Clause,* 92 Mich. L.Rev. 398, 436 (1993).

regulated exclusively by the State. *See Roberts v. Consolidation Coal Co.*, 208 W.Va. 218, 234, 539 S.E.2d 478, 494 (2000) (" 'It has been held repeatedly by this Court that the right to workmen's compensation benefits is based wholly on statutes, in no sense based on the common law; that such statutes are sui generis and controlling; that the rights, remedies and procedures thereby provided are exclusive[.]' " (citation omitted)); *Boyd v. Merritt*, 177 W.Va. 472, 474, 354 S.E.2d 106, 108 (1986) ("The right to workers' compensation benefits is wholly a creature of statute[.]"); *Lester v. State Workmen's Comp. Comm'r*, 161 W.Va. 299, 315, 242 S.E.2d 443, 452 (1978) ("[T]he legislature has the power to modify this state's industrial insurance program as it sees fit so long as no constitutional provision is infringed."); *Bailes v. State Workmen's Comp. Comm'r*, 152 W.Va. 210, 212, 161 S.E.2d 261, 263 (1968) ("The right to workmen's compensation is wholly statutory and is not in any way based on the common law. The statutes are controlling and the rights, remedies and procedure provided by them are exclusive."); Syl. pt. 2, in part, *Dunlap v. State Comp. Dir.*, 149 W.Va. 266, 140 S.E.2d 448 (1965) ("The right to workmen's compensation benefits is wholly statutory."). The State's regulatory authority would include the regulation of premiums charged to the self-insured employers in this case. However, prior to the adoption of Resolution No. 11, the State had never sought to regulate payment of the deficit that accrued in the Second Injury Fund from 1947 to 1997.[25] *See Toledo Area AFL–CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir.1998) ("If that enterprise has previously been regulated with respect to the particular aspect that is the subject of the challenged legislation, then it may be assumed that further legislation of that specific area does not work as substantial an impairment as a law affecting a hitherto unregulated aspect of the industry."). As a result of fifty years of inaction by the State, the self-insured employers did not have "a fair warning of an impending intervention into their contracts with [the State]."

*In re Workers' Comp. Refund*, 46 F.3d at 820. Consequently, the mere fact that the State had previously regulated the premiums paid by the self-insured employers, does not automatically render insignificant the State's decision to force the self-insured employers to share the financial burden of retiring a six billion dollar Second Injury Fund debt. *See In re Workers' Comp. Refund*, 46 F.3d at 820 (finding substantial impairment in the context of the heavily-regulated workers' compensation insurance industry).

The self-insured employers in this case had a reasonable expectation that, because of their self-insured status, they would not be assessed premium charges to reduce a six billion dollar deficit to which they did not contribute, and were contractually exempt from having to pay. *See Toledo Area AFL–CIO Council*, 154 F.3d at 324 ("[S]howing the affected term induced the parties to enter into the contract is *sufficient* to establish a substantial impairment for purposes of the Contracts Clause."); *Baltimore Teachers Union v. Mayor & City Council*, 6 F.3d 1012, 1018 (4th Cir.1993) ("[W]here the contract right or obligation impaired was one that induced the parties to enter into the contract . . . the impairment must be considered 'substantial' for purposes of the Contracts Clause."). Indeed, for fifty years the Second Injury Fund deficit was rightly thought to be the exclusive responsibility of the State. *See Cline v. State Workmen's Comp. Comm'r*, 156 W.Va. 647, 652, 196 S.E.2d 296, 299 (1973) ("[W]e observe that in cases resulting in a life award from the 'second injury' reserve . . . , the real adversary party is not the employer who is chargeable only for permanent partial ratings. It is the Workmen's Compensation Fund which must bear the burden of payment of the total and permanent disability award. Under the statutory scheme . . . it would seem appropriate for the Fund to be represented by its counsel or by the Office of the Attorney General." (citations omitted)).

---

**25.** The State had regulations in place, which were never followed, that were designed to take money from the general Workers' Compensation Fund and place it in the Second Injury Fund. There was never any regulation in place for paying off the unfunded Second Injury Fund debt.

The State's imposition of premium taxes upon the self-insured employers, in an amount calculated to contribute to a reduction of the six billion dollar deficit, has caused a substantial increase in the amount of premium taxes the self-insured employers are required to pay. For fiscal year 1998, Weirton Steel was charged $206,000 as its first annual payment for reducing the Second Injury Fund deficit. For the same year Pine Ridge was charged $271,228 as its first annual payment for reducing the Second Injury Fund deficit. Finally, for fiscal year 1998 Eastern Associated was charged $7,265,945 as its first annual payment for reducing the Second Injury Fund deficit.

The annual Second Injury Fund debt reduction premiums being charged to the self-insured employers substantially impairs the contract they have with the State. The additional annual premium charges must be paid even though the employers, as self-insureds, are still exclusively financially obligated to their respective employees for the payment of workers' compensation benefits. "[T]his substantial impairment was not foreseeable[.]" *Equipment Mfrs. Inst. v. Janklow,* 300 F.3d 842, 859 (8th Cir.2002).

### B. Public Purpose

The next point of analysis in a Contract Clause claim requires a consideration of whether the State has a significant and legitimate public purpose behind adoption of Resolution No. 11.[26] The United States Supreme Court discussed the issue in *United States Trust Co.,* 431 U.S. at 25–26, 97 S.Ct. at 1519 as follows:

> The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake.

(Footnote omitted). *See also Nieves,* 819 F.2d at 1243 ("If the state is a party to the contract, such deference is inappropriate, and the court may inquire whether a less drastic alteration of contract rights could achieve the same purpose[.]").

It is clear that under the decision in *United States Trust* "courts are not to grant carte blanche deference to a legislative assessment of what is reasonable legislation. Reasonableness must filter through a more stringent analysis." *State ex rel. West Virginia Reg'l Jail & Corr. Facility Auth. v. West Virginia Inv. Mgmt. Bd.,* 203 W.Va. 413, 426, 508 S.E.2d 130, 143 (1998) (Davis, C.J., dissenting). *See also Lipscomb v. Columbus Mun. Separate Sch. Dist.,* 269 F.3d 494, 511 (5th Cir.2001) ("The State is a party to the contracts, so we cannot defer in the manner of due process to the State's judgment of the reasonableness of its threatened action." (footnote omitted)); *Parker v. Wakelin,* 123 F.3d 1, 5 (1st Cir.1997) ("Where the contract allegedly impaired is one created, or entered into, by the state itself, less deference to a legislative determination of reasonableness and necessity is required[.]"); *McGrath v. Rhode Island Ret. Bd.,* 88 F.3d 12, 16 (1st Cir.1996) ("[W]hen a state is itself a party to a contract, courts must scrutinize the state's asserted purpose with an extra measure of vigilance."). In other words, "[w]hen a State itself enters into a contract, it cannot simply walk away from its financial obligations." *Energy Reserves Group, Inc. v. Kansas Pow-*

---

26. "If there is an emergency, a state may be permitted to impair a contract that it would not normally be allowed to impair. If the honoring of a contract somehow jeopardizes the government, then there is sufficient reason to justify a modification of that contract." Mark Strasser, *Constitutional Limitations and Baehr Possibilities: On Retroactive Legislation, Reasonable Expectations, and Manifest Injustice,* 29 Rutgers L.J. 271, 290 (1998) (footnote omitted). The facts prompting adoption of Resolution No. 11 do not establish an emergency. *See Home Bldg. & Loan*

*Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (applying emergency doctrine in holding that a new law did not violate the Contract Clause). *But see Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (striking down legislation reducing pension rights as violation of Contract Clause); *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) (declaring illegal retroactive reduction of guarantees to bond holders).

*er & Light Co.,* 459 U.S. 400, 412 n. 14, 103 S.Ct. 697, 705 n. 14, 74 L.Ed.2d 569 (1983). Consequently, "the Contract Clause limits otherwise legitimate exercises of state legislative authority, and the existence of an important public interest is not always sufficient to overcome that limitation." *United States Trust,* 431 U.S. at 21, 97 S.Ct. at 1517.

The public purpose behind Resolution No. 11 is to pay off the Second Injury Fund's six billion dollar deficit and salvage the workers' compensation system without having to impose a special premium tax on the employees of nonself-insured employers or imposition of some other special tax on the general public. Although this purpose may be legitimate, its legitimacy does not rise to the level of satisfying the Contract Clause. "Something more than the showing made to survive rational basis scrutiny is required to justify such an impairment. The hurdle is even higher given the [S]tate's obvious self-interest[.]" *Toledo Area AFL–CIO Council v. Pizza,* 154 F.3d 307, 326 (6th Cir.1998).

The United States Supreme Court has observed that a State's "taxing power may have to be exercised if debts are to be repaid." *United States Trust,* 431 U.S. at 24, 97 S.Ct. at 1519. That is, "a State cannot refuse to meet its legitimate financial obligations simply because it would prefer [not to raise taxes] to promote the public good[.]" *Id.* at 29, 97 S.Ct. at 1521. "If a State could reduce its financial obligations whenever it wanted to [by breaching its own contract] for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." *Id.* at 26, 97 S.Ct. at 1519 (footnote omitted).[27] Insofar as the State sought to maintain the viability of the workers' compensation program by invalidating its contract with the self-insured employers, and imposing draconian costs upon them, the Contract Clause cannot support its purpose as being legitimate.

**27.** "The case law does suggest that there is at least one particular governmental purpose, conserving on expenditures, that will be considered insufficient to justify contract impairment. Where this is the sole basis for governmental impairment of its own contract obligations, liability for breach is likely to be found." Joshua I. Schwartz, *Liability for Sovereign Acts: Congru-*

### C. Adjustment of Rights

Assuming, for the sake of argument, that a constitutionally legitimate public purpose supported Resolution No. 11, the resolution would still violate the Contract Clause because its adjustment of the rights of the contracting parties is "not based upon reasonable conditions [and] is not of a character appropriate to the public purpose justifying [its] adoption." *In re Workers' Comp. Refund,* 46 F.3d at 817. "Framed another way, this inquiry entails an 'overall determination of reasonableness.'" *Nieves,* 819 F.2d at 1249 (quoting *United States Trust,* 431 U.S. at 22 n. 19, 97 S.Ct. at 1518 n. 19).

Under the terms of the State's contract with Eastern Associated, Pine Ridge and Weirton Steel, the State had the exclusive responsibility for funding the Second Injury Fund. The State, through W. Va.Code § 23–3–1(a), promised to fund the Second Injury Fund through monies it received from nonself-insured employers who subscribed to the State's general Workers' Compensation Fund.[28] This Court has previously acknowledged that self-insured employers, like Eastern Associated, Pine Ridge and Weirton Steel, "elect[ed] to make direct payments of compensation in lieu of subscribing to the Workers' Compensation Fund." *Deller v. Naymick,* 176 W.Va. 108, 110 n. 5, 342 S.E.2d 73, 75 n. 5 (1985). Consequently, "[e]xcept for the *small charges for administrative expenses,* self-insured employers make no payments into the Workmen's Compensation Fund[.]" *Smith v. State Workmen's Comp. Comm'r,* 159 W.Va. 108, 116, 219 S.E.2d 361, 366 (1975) (emphasis added).

Through Resolution No. 11, the State has, in effect, repudiated its promised method of funding the Second Injury Fund. Under W. Va.Code § 23–3–1(b) "[a] portion of all premiums that [must] be paid into the workers' compensation fund *by subscribers not electing to carry their own risk*" was supposed to

*ence and Exceptionalism in Government Contracts Law,* 64 Geo. Wash. L.Rev. 633, 699 (1996).

**28.** As previously noted, Eastern Associated contracted to pay a specific premium tax for its subscription to the Second Injury Fund.

be set aside for the Second Injury Fund. *Id.* (emphasis added). For fifty years the State failed to carry out its exclusive responsibility to allocate money for the Second Injury Fund as required by W. Va.Code § 23-3-1(b).

West Virginia Code § 23-3-1(b) constituted a promise by the State that self-insured employers did not have any responsibility to the Second Injury Fund-the State had exclusive responsibility for making payments into and out of the Second Injury Fund. The United States Supreme Court has held that " '[a] promise to pay, with a reserved right to deny or change the effect of the promise, is an absurdity.' " *United States Trust,* 431 U.S. at 25 n. 23, 97 S.Ct. at 1519 n. 23 (quoting *Murray v. Charleston,* 96 U.S. 432, 445, 24 L.Ed. 760, 763 (1877)). Resolution No. 11 is an absurdity that is not based upon reasonable conditions, nor is it of a character appropriate to the public purpose justifying its adoption. The resolution totally relieves the State of its exclusive responsibility for funding the Second Injury Fund as required by W. Va.Code § 23-3-1(b), and forces self-insured employers to undertake that responsibility while maintaining their financial responsibilities to their own employees. Clearly there is nothing reasonable about these conditions in light of the contract the State had with Eastern Associated, Pine Ridge and Weirton Steel, and the viable alternative of taxing wages of nonself-insured employees.

Even if I " '[a]ccept[ ] the principle that the [S]tate's duty to maintain the fiscal integrity of the [workers' compensation system] through actuarial soundness is a valid basis for some changes [to pay the deficit], nevertheless, the [S]tate's unilateral [breach of its contract with the self-insured employers] cannot pass constitutional muster and must fall.' " *Association of Pennsylvania State Coll. & Univ. Faculties v. State Syst. of*

*Higher Educ.,* 505 Pa. 369, 377, 479 A.2d 962, 966 (1984) (citation omitted). The State cannot impose "a drastic impairment when an evident and more moderate course would serve its purposes equally well." *United States Trust,* 431 U.S. at 31, 97 S.Ct. at 1522. "While the need to keep the workmen's compensation fund on a sound financial basis may justify prospective legislation designed for that purpose, it cannot justify this type of retrospective legislation." *Nieves,* 819 F.2d at 1252.

## III. DUE PROCESS

By imposing a premium upon self-insured employers to recover funds to reduce a long standing debt of the Workers' Compensation Division, the State has enacted severe retroactive legislation and has thereby violated the Due Process Clause of the Fifth Amendment to the United States Constitution. In reaching this conclusion, I am persuaded by Justice Kennedy's separate opinion in *Eastern Enterprises v. Apfel,* 524 U.S. 498, 539, 118 S.Ct. 2131, 2154, 141 L.Ed.2d 451 (1998) (Kennedy, J., concurring in the judgment and dissenting in part).

In *Eastern,* the United States Supreme Court was presented with a challenge similar to the one presented in this case. Eastern Enterprises challenged the Coal Industry Retiree Health Benefit Act of 1992 (hereinafter "the Coal Act"). The Coal Act had "establish[ed] a mechanism for funding health care benefits for retirees from the coal industry and their dependents." *Eastern,* 524 U.S. 498, 504, 118 S.Ct. 2131, 2137, 141 L.Ed.2d 451. To accomplish its goals, the Coal Act obtained funding by imposing "annual premiums assessed against ... coal operators that had signed any [National Bituminus Wage Agreement] [29] or any other agreement requiring contributions to the 1950 or 1974 Benefit Plans." [30] 524 U.S. at

---

**29.** The National Bituminus Coal Wage Agreement (hereinafter "NBCWA") of 1947 "established the United Mine Workers of America Welfare and Retirement Fund.... The Fund was to use the proceeds of a royalty on coal production to provide pension and medical benefits to miners and their families." *Eastern,* 524 U.S. at 505–06, 118 S.Ct. at 2138.

**30.** In 1950, another NBCWA was executed. It "created a new multiemployer trust, the United Mine Workers of America Welfare and Retirement Fund of 1950 (1950 W & R Fund)." *Eastern,* 524 U.S. at 506, 118 S.Ct. at 2138. Following enactment of the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), the United Mine Workers of America (UMWA) and the Bituminus Coal Operators As-

514, 118 S.Ct. at 2142. Under the Coal Act, premiums could be assessed against these signatory companies so long as they derived revenue from " 'any business activity, whether or not in the coal industry.'" *Id.* (citations omitted). Moreover, "[w]here a signatory [was] no longer involved in any business activity, premiums [were] levied against 'related person[s],' including successors in interest and businesses or corporations under common control." *Id.* (citations omitted). Eastern Enterprises had transferred its coal-related operations to a subsidiary by the end of 1965. *Id.* at 516, 118 S.Ct. at 2143. Though Eastern Enterprises retained a stock interest in the subsidiary for some time, it ultimately sold its interest in 1987. *Id.* Nevertheless, pursuant to the Coal Act, Eastern Enterprises was assigned the obligation for premiums "respecting over 1,000 retired miners who had worked for [it] before 1966." *Id.* at 517, 118 S.Ct. at 2143. Eastern Enterprises's obligation was based upon its "status as the pre–1978 signatory operator for whom [the subject retiree] miners had worked for the longest period of time. . . . Eastern's premium for a 12–month period exceeded $5 million." *Id.* (citations omitted). A plurality of the *Eastern* Court decided that the Coal Act violated the Takings Clause. Justice Kennedy, however, while agreeing that the Coal Act was unconstitutional, opined that Coal Act had violated the Due Process Clause of the Constitution of the United States.

Justice Kennedy explained that,

due process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity. Groups targeted by retroactive laws, were they to be denied all protection, would have a justified fear that a government once formed to protect expectations now can destroy them. Both stability of

investment and confidence in the constitutional system, then, are secured by due process restrictions against severe retroactive legislation.

*Eastern,* 524 U.S. at 549, 118 S.Ct. at 2159. Indeed, "for centuries our law has harbored a singular distrust of retroactive statutes." *Id.* at 547, 118 S.Ct. at 2158 (citing plurality opinion at 532–33, 118 S.Ct. at 2151).

Conducting a due process analysis of a severe retroactive law "requires an inquiry into whether in enacting the retroactive law the legislature acted in an arbitrary and irrational way." *Id.* at 549, 118 S.Ct. at 2159. In other words, we must ask whether "the remedy created by the [regulation] bears [a] legitimate relation to the interest which the Government asserts in support of the [law]. . . . In our tradition, the degree of retroactive effect is a significant determinant in the constitutionality of a statute." *Id.* (Citations omitted).

The instant case is similar to *Eastern* in that the State, by virtue of Resolution No. 11, is imposing a severe retroactive regulation that fashions a remedy "bear[ing] no legitimate relation to the interest which the Government asserts in support of that legislation." *Id.* Resolution No. 11 charges self-insured employers a substantial amount to reduce a six billion dollar debt that was created, not by these self insured employers, but by the State itself. For a fifty-year period the State has failed to maintain a Second Injury Fund, even though it had the exclusive responsibility to do so. *See* W. Va.Code § 23–3–1(a).[31] Beginning in 1998, the State, under the authority of Resolution No. 11, has charged self-insured employers millions of dollars to reduce this debt even though the employers are exempt from any responsibility to fund the Second Injury

sociation (BOCA) entered into a new agreement in an effort to comply with ERISA. *Id.* at 509, 118 S.Ct. at 2139. The new agreement, known as the 1974 NBCWA, "created four trusts, funded by royalties on coal production and premiums based on hours worked by miners, to replace the 1950 W & R Fund." *Id.*

Two of the new trusts, the UMWA 1950 Benefit Plan and Trust (1950 Benefit Plan) and the UMWA 1974 Benefit Plan and Trust (1974

Benefit Plan), provided nonpension benefits, including medical benefits. Miners who retired before January 1, 1976, and their dependents were covered by the 1950 Benefit Plan, while active miners and those who retired after 1975 were covered by the 1974 Benefit Plan. *Id.*

31. *See supra* note 14 for the text of W. Va.Code § 23–3–1(a).

Fund. *See* W. Va.Code § 23–3–1(b).[32] AQs I explained earlier in this dissenting opinion, Pine Ridge and Weirton Steel have never subscribed to the Second Injury Fund. They have fulfilled their obligation to their second injury employees by direct payment of claims. Nevertheless, the State, via Resolution No. 11, is retroactively subscribing Pine Ridge and Weirton Steel to the Second Injury Fund for a period of time when they were self-insured. Thus, they are being forced to retroactively pay premiums for the benefit of second injury employees of nonself-insured employers. While Eastern Associated did subscribe to the Second Injury Fund, Eastern Associated was assessed a special premium tax to cover its participation in that fund. *See* W. Va.Code § 23–2–9(e)(3)(A).[33] Thus, Resolution No. 11 is causing Eastern Associated to retroactively pay additional premiums for the benefit of second injury employees of nonself-insured employers. The amount of the retroactive premiums is substantial. For Fiscal Year 1998, self-insured employers as a whole were assessed more than forty-five million to reduce the deficit. The premiums imposed upon Weirton Steel were $206,000 for Fiscal Year 1998. Pine Ridge was assessed $271,228 for the year, and Eastern Associated was assessed $7,265,945. Finally, I contend that Resolution No. 11 bears no legitimate relation to the interest which the Government has asserted. Self-insured employers did not create the six billion dollar deficit the State is seeking to reduce. That deficit was created by the State's failure to fund the Second Injury Fund as it was legislatively mandated to do. To now charge self-insured employers, who have fulfilled their obligation to their second injury employees, to relieve a debt created by the unlawful actions of the State is simply wrong.

An economic regulation may be found to violate the Due Process clause only under the most egregious circumstances:

> Finding a due process violation in this case is consistent with the principle that "under the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means." ... Statutes may be invalidated on due process grounds only under the most egregious of circumstances. This case represents one of the rare instances in which even such a permissive standard has been violated.

*Eastern,* 524 U.S. at 550, 118 S.Ct. at 2159. As with the Coal Act, Resolution No. 11 represents a rare instance where an economic regulation violates due process because of its severe retroactive impact and because its enactment was arbitrary and irrational.

## IV. TAKINGS CLAUSE

The Fifth Amendment to the United States Constitution proscribes the taking of private property for public use without just compensation. It has been explained that, "[t]he aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Eastern,* 524 U.S. at 522, 118 S.Ct. at 2146 (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). "The Fifth Amendment applies to the states through the Fourteenth Amendment." *United States Fid. & Guar. Co. v. McKeithen,* 226 F.3d 412, 416 n. 7 (5th Cir.2000) (citation omitted). By increasing the premium tax charged to self-insured employers by an amount intended to reduce a six billion dollar debt to which the self-insured employers did not contribute, the State has perpetrated an unconstitutional taking of the self-insured employers' property.

In the *Eastern* case discussed in the preceding section, one of the grounds asserted by Eastern Enterprises in challenging the premiums it was charged for retiree health care benefits was that the premiums violated the Takings Clause. The Court acknowledged that, while not a taking in the classic sense, "economic regulation ... may nonetheless effect a taking." 524 U.S. at 523, 118 S.Ct. at 2146. The High Court went on to explain that:

---

**32.** *See supra* note 16 for the text of W. Va.Code § 23–3–1(b).

**33.** *See supra* note 19 for the text of W. Va.Code § 23–2–9(e)(3)(A).

[o]f course, a party challenging governmental action as an unconstitutional taking bears a substantial burden. See *United States v. Sperry Corp.,* 493 U.S. 52, 60[, 110 S.Ct. 387, 393–394, 107 L.Ed.2d 290] (1989). Government regulation often "curtails some potential for the use or economic exploitation of private property," *Andrus v. Allard,* 444 U.S. 51, 65[, 100 S.Ct. 318, 326, 62 L.Ed.2d 210] (1979), and "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense," *Armstrong, supra,* at 48[, 80 S.Ct. at 1568.] In light of that understanding, the process for evaluating a regulation's constitutionality involves an examination of the "justice and fairness" of the governmental action. See *Andrus,* 444 U.S., at 65[, 100 S.Ct., at 327]. That inquiry, by its nature, does not lend itself to any set formula, see ibid., and the determination whether " 'justice and fairness' require that economic injuries caused by public action [must] be compensated by the government, rather than remain disproportionately concentrated on a few persons," is essentially ad hoc and fact intensive, *Kaiser Aetna v. United States,* 444 U.S. 164, 175[, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979)] (internal quotation marks omitted).

*Eastern,* 524 U.S. at 523, 118 S.Ct. at 2146. The Court then stated that it had identified the following three factors that are of "particular significance" to a Takings Clause analysis of an economic regulation: (1) "[T]he economic impact of the regulation;" (2) "its interference with reasonable investment backed expectations;" and (3) "the character of the governmental action." *Id.* at 523–24, 118 S.Ct. at 2146 (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979)). Applying the three-part test, the Court concluded that the premiums assessed against Eastern Enterprises did, in fact, amount to an unconstitutional taking of Eastern Enterprises' property.

Following the lead of the *Eastern* plurality, the United States Court of Appeals for the Fifth Circuit has applied the three-part test in the context of a Workers' Compensation case involving the funding formula for calculating premiums to be paid into the Louisiana Workers' Compensation Second Injury Fund by insurers. *United States Fid. & Guar. v. McKeithen,* 226 F.3d 412. In *McKeithen,* numerous insurers challenged Act 188 (hereinafter "the Act"), which contained a funding formula that calculated premiums based upon "the insurer's volume of business written in earlier years," and was made retroactive to insurance policies written before passage of the legislation imposing the funding formula. *Id.* at 415. The Act was also "made expressly applicable to workers' compensation insurers who, prior to the Act's passage, had withdrawn from the Louisiana market or had substantially reduced their underwriting in the state." *Id.* Applying the three-part test announced in *Eastern,* the Fifth Circuit concluded that the Takings Clause had been violated. Following the *Eastern* and *McKeithen* cases, I will analyze the premium tax charged to the self-insured employers in the case *sub judice* under the three factor test set out in *Eastern.*

### A. Economic Impact of the Regulation

With respect to the first factor, the economic impact of the regulation, the Supreme Court in *Eastern* concluded that there was no doubt the Coal Act had "forced a considerable financial burden upon Eastern." *Id.* at 529, 118 S.Ct. at 2149. In reaching this conclusion, the Court noted that Eastern's cumulative payments under the Coal Act would be between fifty to one-hundred million dollars, and that it was "clearly deprived of the amounts it must pay." *Id.* The Court also noted that "an employer's statutory liability for multiemployer plan benefits should reflect some 'proportion[ality] to its experience with the plan.' " *Id.* at 530, 118 S.Ct. at 2149 (citation omitted). The Court explained that "[t]he company's obligations under the [Coal] Act depend solely on its roster of employees some 30 to 50 years before the statute's enactment, without any regard to responsibilities that Eastern accepted under any benefit plan the company itself adopted." *Id.* at 531, 118 S.Ct. at 2150.

The *McKeithen* Court, in discussing this factor, observed that consideration should be given "not only [to] the financial burden [im-

posed by the Act], but also the proportionality between that burden and the insurers' experience with the [Second Injury Fund]." 226 F.3d at 416. In finding that the Act imposed a considerable and novel financial burden on insurers, who had paid a net amount of zero for claims made on the Second Injury Fund prior to enactment of the new funding scheme, the Court observed that the Act was estimated to cost the various insurers five million dollars in its first year of enactment and forty-five million dollars in the future. *Id.* at 416–17. Moreover, the insurers who had discontinued or substantially reduced their volume of business in Louisiana had no practical way of recouping the premium. *Id.* at 417. Finally, the Court commented:

> The newly-created liability reflects no proportionality to the plaintiffs' experience with the SIF [Second Injury Fund]. For over twenty years before Act 188, plaintiffs were an intermediary for the SIF. They collected assessments from employers and received SIF reimbursement for payment of second injury benefits. They received no net benefits and incurred no net costs. Defendants do not argue that the policy and purpose of the SIF have changed since its inception in 1974. But under Act 188, plaintiffs must make significant net contributions to the fund. Act 188 thus imposes costs on parties that never profited from the SIF.

*Id.*

In the instant case, the State has imposed a substantial financial burden on self-insured employers that bears no relationship to their experience with the Second Injury Fund. For Fiscal Year 1998 alone, self-insured employers as a whole were assessed more than forty-five million dollars under Resolution No. 11 to reduce the deficit. The premiums imposed upon the appellants individually for that single year were similarly substantial. Weirton Steel was assessed $206,000, Pine Ridge was assessed $271,228, and Eastern Associated was assessed $7,265,945. These premiums were assessed against these self-

insured employers notwithstanding the fact that they had already fulfilled their obligations to their second-injury employees that arose during the period during which the deficit was created.[34] Clearly, then, the sizable premiums imposed under Resolution No. 11 for Fiscal Year 1998 have no relation to these self-insured employers' experience with the Second Injury Fund.

### B. Interference with Reasonable Investment Backed Expectations

In addressing the second element of the test, whether the regulation interferes with reasonable investment-backed expectations, the *Eastern* Court expressed concern over the retroactivity of the Coal Act. With respect to a regulation's imposition of a retroactive liability, the Court explained

> Congress ... may impose retroactive liability to some degree, particularly where it is "confined to short and limited periods required by the practicalities of producing national legislation." [*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 731, 104 S.Ct. 2709, 2719, 81 L.Ed.2d 601 (1984)] (internal quotation marks omitted). Our decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.

*Eastern* at 528–29, 118 S.Ct. at 2149. Regarding Eastern Enterprises claims, the Court remarked that

> the Coal Act operates retroactively, divesting Eastern of property long after the company believed its liabilities under the 1950 W & R Fund to have been settled. And the extent of Eastern's retroactive liability is substantial and particularly far reaching.... The distance into the past that the Act reaches back to impose a

---

**34.** Pine Ridge and Weirton Steel fulfilled their obligations by directly paying the Second Injury claims of their employees. Eastern Associated fulfilled its obligation by paying the special pre-

miums tax associated with its subscription to the Workers' Compensation Fund. *See* W. Va.Code § 23–2–9(d)(3)(B).

liability on Eastern and the magnitude of that liability raise substantial questions of fairness.

*Id.* at 534, 118 S.Ct. at 2152 (internal citations omitted). The *Eastern* Court ultimately concluded that nothing included in the plans in which Eastern Enterprises had participated prior to its exit from the coal industry, and nothing in the pattern of the Federal Government's involvement in the coal industry, could have led Eastern Enterprises to conclude that it would have a future responsibility for providing lifetime health benefits to its retirees and their families. *Id.* at 535–36, 118 S.Ct. at 2152.

In the *McKeithen* case, the Fifth Circuit similarly observed that "[r]etroactivity is generally disfavored in the law .... Retroactive legislation, as opposed to the prospective kind, can present more severe problems of unfairness because it can upset legitimate expectations and settled transactions." 226 F.3d at 418 (citations omitted). The retroactive application of the Act at issue in *McKeithen* "reached back at least twenty years to upset the plaintiffs' reliance on the cost-neutrality of the [prior] funding scheme." *Id.* The defendants in *McKeithen* argued that the companies' economic expectations were "unreasonable because the insurance industry is heavily regulated and because the plaintiffs knew of the [Second Injury Fund's] need for annual funding and knew that benefits-based assessments are prescribed in many other states." *Id.* at 418. The Court rejected all of these arguments, ultimately concluding that there was "no pattern of conduct on the state's part that could have given the plaintiffs sufficient notice [of the new funding scheme]." *Id.* at 419.

Here Resolution No. 11 reaches back fifty years, the duration of the time the State created a six billion dollar deficit by failing to fulfill its legislatively mandated duty to fund the Second Injury Fund. *See* W. Va.Code § 23–3–1(a). As self-insured employers not subscribing to the Second Injury Fund, Pine Ridge and Weirton Steel were legislatively exempt from any responsibility to fund the Second Injury Fund. *See* W. Va.Code § 23–3–1(b). While Eastern Associated did subscribe to the Second Injury Fund, it was assessed a special premium tax to cover that participation. *See* W. Va.Code § 23–2–9(e)(3)(B). Because these employers fulfilled their obligation to their own employees, either by directly paying second injury claims, or by paying the properly assessed special premium tax for participation in the Workers' Compensation Second Injury Fund, Resolution No. 11 is causing them to retroactively pay additional premiums for the benefit of second injury employees of nonself-insured employers. Moreover, these self-insured employers had the reasonable expectation that the state would fulfill its legal duty to fund the Second Injury Fund. They had no way of anticipating that the State would charge them hundreds of thousands, or even millions, of dollars per year to reduce a six billion dollar debt created by the State's unlawful failure to fund the Second Injury Fund. This is true in spite of the fact that the State's workers' compensation system is heavily regulated. Prior to the adoption of Resolution No. 11, the State had never sought to regulate payment of the deficit that accrued in the Second Injury Fund from 1947 to 1997. Due to this fifty years of inaction by the State, the self-insured employers could not have had "sufficient notice" of a new funding scheme. *See McKeithen*, 226 F.3d at 419.

## C. Character of the Governmental Action

With regard to the final element, the character of the governmental action, the *Eastern* Court stated

the nature of the governmental action in this case is quite unusual. That Congress sought a legislative remedy for what it perceived to be a grave problem in the funding of retired coal miners' health benefits is understandable; complex problems of that sort typically call for a legislative solution. When, however, that solution singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused, the governmental action implicates fundamental principles of fairness underlying the Takings Clause. Eastern cannot

be forced to bear the expense of lifetime health benefits for miners based on its activities decades before those benefits were promised.

*Id.* at 537, 118 S.Ct. at 2153.

The Fifth Circuit similarly found the nature of the government action at issue in *McKeithen* to be unusual. In this regard, the Court remarked

> [w]ithout identifying a compelling problem, such as the financial insecurity of the SIF, the state enacted a solution that "singles out certain [parties] to bear a burden that is substantial in amount, based on the [parties'] conduct far in the past, and unrelated to any commitment that the [parties] made or to any injury they caused ...."

226 F.3d at 419 (citation omitted).

Here the State has singled out self-insured employers to bear a significant burden that they had no role in creating. Rather, the debt sought to be relieved by Resolution No. 11 was created by the State's unlawful conduct perpetuated over fifty years of failing to fund the Second Injury Fund as it was statutorily required to do. The employers here were either exempted from paying into the Second Injury Fund, or were charged a premium tax for their years of participation in the Fund during those years they participated. Consequently, I conclude that the State's action in assessing a retroactive pre-mium against these self-insured employers "implicates fundamental principles of fairness underlying the Takings Clause." *Eastern*, 524 U.S. at 537, 118 S.Ct. at 2153.

## V. CONCLUSION

"The evil that men do lives after them; The good is oft interred with their bones." William Shakespeare, *Julius Caesar* act 3, sc. 2. The majority opinion in this case represents an evil that will, if left unchanged, live to corrupt the already deeply troubled West Virginia Workers' Compensation Program and threaten the corresponding rights and liabilities of this State's employers for generations to come. Simply stated, I cannot condone such a result and its ensuing devastating effect on the economy of West Virginia. For the reasons explained above, it is plain that Resolution No. 11 violates the Contract, Due Process, and Takings Clauses of the United States Constitution. Accordingly, I dissent. I am authorized to state that Justice MAYNARD joins me in this dissenting opinion.